[*No. 27641. Department Two. November 28, 1939.*]

ELMER J. WHITE, *Appellant*, v. J. R. WATKINS PRODUCTS COMPANY, *Respondent*.[1]

*J. Speed Smith* and *Henry Elliott, Jr.*, for appellant.

*Skeel, McKelvy, Henke, Evenson & Uhlmann*, for respondent.

GERAGHTY, J.—This action was instituted by the plaintiff, Elmer J. White, to recover from the J. R. Watkins Products Company for property damage sustained through a collision between the plaintiff's car and a car driven by C. J. King. King was named as a

[1]Reported in 96 P. (2d) 456.

party defendant in the complaint, but died before the action came to trial. The cause was tried to the court, sitting without a jury. Findings of fact and conclusions of law were made by the court, upon which a judgment of dismissal was entered. The plaintiff appeals.

The appeal comes here on an agreed statement of the case, in which the parties stipulate that the sole question involved is whether the trial court erred in making its fourth finding of fact, as follows:

"That at said time and place the said defendant C. J. King was operating his automobile as an independent contractor, and was not subject to the control of the defendant J. R. Watkins Products Co., and that at said time and place the said C. J. King was an independent contractor, and that said defendant J. R. Watkins Products Co. had no right to control the said C. J. King in the manner in which he was operating his car; and that the said C. J. King was not an agent of the said J. R. Watkins Products Co. at the time of said accident."

The evidence upon this issue is not in conflict and consists almost entirely of a written contract between King and the respondent, the deposition of C. J. King, taken shortly before his death, and the testimony of Thomas E. Dosch, branch manager of the respondent. From this evidence, the following material facts appear:

The respondent does not sell its products to the trade, but distributes them solely through dealers or route men, to each of whom is assigned a defined district, within which he may sell the respondent's products. King's attention was attracted to an advertisement published by the respondent for a route man and made application for a route upon a blank given him by Dosch. In the application blank, certain questions were asked and answered, in writing, by King, among them, how much time he would devote to the busi-

ness; whether he had a car; the kind of work he was then doing, and what work he had formerly done; how many were dependent upon him for support. He was required to give the names and addresses of three of his friends or acquaintances, and to state whether he could invest twenty-five dollars in a supply of Watkins' products.

On receipt of the application, a written agreement was entered into between the parties, wherein the respondent promised and agreed to deliver to King, designated as purchaser, f. o. b. cars at Seattle, or, at its option, at any of its regular places of shipment or delivery, as much of the goods manufactured by it, at the usual and customary wholesale prices, as he might reasonably require for resale in district No. 27, in the city of Seattle; and the purchaser agreed to pay the wholesale prices for the goods delivered to him. The agreement provided that the purchaser might return, by prepaid freight, to the company, in as good condition as when delivered, all of the goods purchased by him and undisposed of; and the company agreed to repurchase such returned goods at the prevailing wholesale price. The agreement provided:

"As tending to increase the business of the purchaser and the volume of his purchases from the Company, the Purchaser agrees to regularly attend such sales information and sales method conferences as may be conducted by the Company, regularly or from time to time, and the Company agrees to keep the Purchaser advised as to the time and place of holding such conferences. . . .

"The Company shall have no interest in the accounts due Purchaser for goods sold by him; and no printed, advertising or other matter of the Company, sent to, or distributed by the Purchaser, shall be construed to direct or control the sale or other disposition of said goods, or to change or modify the terms of this Agreement.

"And it is further mutually agreed that upon notice in writing the Company may discontinue selling merchandise to the Purchaser and the Purchaser may discontinue purchasing merchandise from the Company."

Dosch, the respondent's local manager, testified that it was not absolutely necessary that a dealer or route man have an automobile to cover his district, but it would be better if he had one. The respondent consigned merchandise to its Seattle office, from which it was sold at wholesale to the route men and by them sold to their customers. King paid cash outright for all merchandise received from the respondent, his compensation or profit being the difference between the wholesale price and his retail selling price to his customers. He was furnished a descriptive retail price list, which was suggestive only; he had the right to fix the retail price higher or lower. He could not be discharged while the agreement was effective, but, if he did not report a sufficient volume of sales, it could be terminated. It will be noted, by referring to the agreement, that provision is made for its termination upon written notice by either party.

In practice, when route men are engaged, they are given sales manuals to study and are accompanied, in their initial canvassing, by a supervisor, who demonstrates the method of approach to a customer and how best to make a sale. Route men are also given blank forms upon which to make weekly reports to respondent's representatives. They are expected to attend weekly meetings, and King had attended such meetings every Friday evening.

Route men carry a sample case filled with respondent's products. They are expected to pay for the case and its contents, but are to be reimbursed for the value of the case on the termination of their agreements. Respondent suggested to them what products to put in

the sample case and furnished them each month with a list of items deemed to be most seasonable. As a means of stimulating trade, route men were furnished with articles not manufactured by the respondent, but purchased by it and sold to them at reduced prices, to enable them, in turn, to pass the articles on to their customers at special prices without lessening their own profits.

The testimony of King was in substantial agreement with that of Dosch, in respect to the arrangement between himself and the respondent. In the course of his examination, he testified:

"Q. What were you told about how much you would have to sell—anything? A. No, sir. We were just to sell all we could. Q. What were you told as to what compensation you were to receive? A. I bought the goods from the Watkins Company and paid cash for them, and I sold at a certain price, and the difference between the prices was my profit. Q. How did you determine your selling price? A. We had a book. Q. You had a book giving you the selling price? A. Yes, sir."

He stated that the accident occurred at one o'clock p. m., July 12, 1937, just after he had made delivery to a customer and while on his way to meet a supervisor of respondent, who was to accompany him on his route that afternoon. At the time of the accident, which occurred within the district assigned to him, he had in his car a supply of the respondent's products. He owned the car he was driving at the time and paid all the expenses of its maintenance and operation.

The accident occurred while King was driving his own car in the course of the business in which he was engaged. If, in the conduct of this business, his relation to the respondent was that of employee or servant, its liability for his negligence would not be af-

fected by the fact that the car was his own and that he was paying the expenses of its operation.

While the parties have stipulated that the sole question on appeal is whether the trial court erred in making finding IV, the appellant calls attention to finding I, which was to the effect that the defendant King was the "duly employed and acting agent" of the respondent.

There is a seeming inconsistency in these findings. It will be noted that finding IV recites that, "at said time and place," King was operating his car as an independent contractor, not subject to the control of the respondent in the manner of its operation, and that he was not an agent of respondent at the "time of said accident."

The quoted words, read in connection with finding I, might imply that the court was of the view that, while King was an employee or agent of the respondent generally, in operating the car he was outside the scope of that employment and not subject to respondent's control. This view, however, is negatived by the court's remarks in announcing its decision, after a review of the evidence at the close of the case:

"But here I do not believe, gentlemen, that I could find that there was that element of control exercisable over this man in his daily routine that would negative the evidence of his independence in his own activities."

Whatever may be the explanation of the conflict in the two findings, finding IV, in accordance with which the judgment was entered, reflects the trial court's definite view that the evidence established the fact that King was an independent contractor.

In *Larson v. American Bridge Co.*, 40 Wash. 224, 82 Pac. 294, 111 Am. St. 904, it is said:

"The general test which determines the relation of independent contractor is that he shall exercise an

independent employment, and represent his employer only as to the results of his work and not as to the means whereby it is to be accomplished. The chief consideration is that the employer has no right of control as to the mode of doing the work; but a reservation by the employer of the right to supervise the work, for the purpose of merely determining whether it is being done in accordance with the contract, does not affect the independence of the relation. 16 Am. & Eng. Ency. Law (2d ed.), 187, 188."

The appellant contends that King was an employee or servant of the respondent and that the evidence shows this to be the fact, because respondent distributed its products wholly through its so-called dealers or route men; that King, in his application, indicated that he was to give full time to the work and would use his own car; that he sold goods under supervision of respondent; made weekly reports to it, attended sales meetings, and was assisted in the sales of respondent's products by the use of leaders, premiums, and bonus coupons.

We are of the opinion, however, that, as disclosed by the evidence, the measure of supervision exercised by the respondent over King's operations was entirely consistent with the relation of independent contractor or dealer in the purchase and sale of its products. King was giving all his time to the business, it is true, but the question whether or not one is pursuing an independent operation does not depend on whether he is serving one person or many. *Leech v. Sultan R. & Timber Co.*, 161 Wash. 426, 297 Pac. 203.

In *Nettleship v. Shipman*, 161 Wash. 292, 296 Pac. 1056, a salesman covering an extensive territory was compensated by a monthly drawing account or salary, with a provision that, if, at the end of the year, the volume of his sales exceeded the amount he had received, he would be paid an agreed percentage for

the excess. In covering his territory, he paid for his own transportation and subsistence, and was free to use any method of transportation that he desired. He used his own automobile, however, to a considerable extent and paid all expenses in connection with its use. Prices were fixed by the wholesaler, but the salesmen could, on occasion, cut the price to some extent if they so desired. Payment for the goods sold was made directly to the wholesaler, who billed the purchasers therefor. Quoting from the opinion:

"Appellant exercised at least some control over Mr. Shipman in the exploiting by him of his territory; it is evident that he was required to cover certain portions thereof once every thirty or sixty days, and that he was supposed to go to Montana three times a year. This control was very general in its nature, appellant being interested only in the results its agents produced, and it is evident that Mr. Shipman was, generally speaking, free to tour his territory at such times and to such extent as he deemed most advantageous.

"Appellant knew that Mr. Shipman owned and often used, in the prosecution of his business, an automobile, but appellant did not instruct him to purchase a car, nor did it at all concern itself with the means of transportation adopted by its salesmen on any particular trip, or in covering any particular territory. Appellant's officers could tell, with some degree of accuracy, by the volume of orders sent in by one of its salesmen, and from the places the orders were taken, whether or not such employee was devoting a proper amount of his time and attention to his work, but it does not appear that any particular check was made by appellant over its traveling salesmen, other than some such general observation."

On this state of facts, evidencing a measure of control comparable to that found in the present case, it was held, after an exhaustive review of the authorities, that the salesman was an independent contractor rather than an employee of the wholesaler.

The demonstration by respondent's supervisor of sales methods to the route men was not inconsistent with the independent character of the latter's business. Certainly, if the respondent had chosen to distribute its products through the regular channels of retail trade and had rendered the same assistance to the merchants selling its products, it would not be thought that thereby the merchants became subject to the respondent's control to such an extent as to make them its employees.

King paid in advance for everything he received from the respondent, including premiums and specials, and, by the terms of his agreement, was free to dispose of the goods so paid for as he saw fit. The respondent could, of course, cancel his agreement on written notice and decline to sell him any more of its products if he did not conform to its policy; but the goods in his possession at all times belonged to him. While the respondent might refuse to make further sales to him, it could not control his disposition of the merchandise he had paid for.

We are of the opinion that the evidence supports the challenged finding IV, and that the judgment should be affirmed.

BLAKE, C. J., STEINERT, BEALS, and JEFFERS, JJ., concur.