WATSON *et al. v.* J. R. WATKINS Co.

(Division A. Feb. 26, 1940.)

[193 So. 913. No. 34059.]

Everett & Everett, of Indianola, for appellants.

**Cooper & Thomas**, of Indianola, for appellee.

438

440

**Anderson, J.,** delivered the opinion of the court.

Appellee, a foreign corporation, brought this action in the circuit court of Sunflower County against appellants, Watson and Campbell, suing the former as principal and the latter as his surety for the balance due under a written contract for the sale of goods. There was a trial on the pleadings and a judgment for appellee, from which judgment appellants prosecute this appeal.

The defense was that appellee had no right to maintain the action because as a foreign corporation it had failed

to comply with Sections 4140 and 4164 of the Code of 1930, which provide that such corporations shall file a copy of their charter with the Secretary of State, and also a written appointment with that officer of a process agent, and upon failure to do so such corporation "shall not be permitted to bring or maintain any action or suit in any of the courts of this state." A copy of the contract follows:

"This Agreement, Made at Winona, Minnesota, this 16th day of July, 1936, between the J. R. Watkins Company, a corporation, hereinafter called 'the Company,' and George E. Watson, of Belzoni, Mississippi hereinafter called 'the Purchaser,' witnesseth,

"1. That in consideration of the promises and agreements of the purchases hereinafter contained, to be kept and performed by him, the Company agrees, unless prevented by fire, strikes, or other causes, to sell and deliver to the Purchaser, at its current wholesale prices, free on board cars at Winona, Minnesota, or at its option, at any of its other regular places of shipment, such goods and other articles manufactured or sold by it, as the Purchaser may reasonably require for sale, from the date hereof, until the first day of April, 1938, in the locality in which he is now engaged, or intends to engage, in business, a description of which locality he agrees to furnish and deliver to the Company in writing prior to its acceptance of this agreement; but the furnishing of such description may be waived by the Company at its election, without notice to the Purchaser or the sureties hereon.

"2. And in consideration thereof, the Purchaser agrees to buy from the Company the goods reasonably required by him as aforesaid; and agrees to furnish to it complete, regular, weekly, written reports, showing separately the amounts of his cash sales, time sales, and collections; which reports, however, or any of them, may be waived by the Company without notice to the sureties hereon, and he also agrees to furnish a complete financial statement when requested to do so.

"3. The Purchaser further agrees to pay the Company its current wholesale prices for the goods and other articles sold to him, as herein provided, and also the prepaid transportation charges thereon, if any, by remitting to the Company each week at least sixty per cent (60%) of the amount received by him from his cash sales, and from his collections on sales previously made, at the time and in the manner and in accordance with the provisions of the weekly report blanks of the Company to be furnished to him; and, at the expiration or termination of this Agreement, to pay the whole amount therefor then remaining unpaid; or the Purchaser may pay for such goods in cash, less the usual cash discount allowed for such payments; but such payments, or any of them, may be waived or extended by the Company without notice to the sureties hereon, and without prejudice to the rights or interest of the Company.

"4. If the Purchaser shall not pay cash for said goods and other articles so sold and delivered to him, and the payments at the time an in the manner hereinbefore provied are insufficient to pay therefor, the Company may, in its discretion, thereafter either limit the sales herein agreed to be made, or from time to time suspend the same, or require cash with each order, or cash upon delivery, until the Purchaser's indebtedness is paid, or reduced, as the Company may require.

"5. The Purchaser may, within thirty days after the expiration or termination of this Agreement, return, by prepaid freight, to the Company, at Winona, Minnesota, Memphis, Tennessee, Newark, New Jersey, or Oakland, California, in as good condition as when delivered to him at point of shipment, any goods purchased by him from the Company, which he may then have on hand; and the Company agrees to repurchase such goods, if in such condition when received by it, and pay or credit the Purchaser therefor at the then prevailing wholesale prices. And, if any goods returned by the Purchaser are not in a salable condition when received by the Company at

any of the places above named, the Company will restore them to such condition, if that can be done, and make a reasonable charge therefor, and deduct such charge from the value of such goods, and pay or credit the Purchaser with the balance. But the Purchaser shall not return, nor the Company pay or allow any credit for, any advertising matter of any kind, or for any goods or articles which have been used, or for any goods which cannot reasonably be restored to a salable condition.

"6. The Purchaser shall have no power or authority to make any statement or representation, or to incur any debt, obligation, or liability of any kind whatsoever, in the name of, or for, or on account of the Company.

"7. The Company shall have no interest in the accounts due for goods sold by the Purchaser; and no printed, advertising or other matter of the Company, sent to, or distributed by the Purchaser, shall be construed to direct or control the sale or other disposition of said goods, or to change or modify the terms of this Agreement.

"8. It is also mutually agreed that this is the complete, entire and only Agreement between the parties, and that it shall not be varied, changed, or modified in any respect except in writing executed by the parties hereto; and that either of the parties hereto may terminate this Agreement at any time, if desired, by giving the other party notice thereof in writing by mail.

"In Witness Whereof, The Company has caused these presents to be executed in its corporate name by its proper officer, and the Purchaser has hereunto set his hand the day and year first above written."

The contract was signed by appellant and Watson, and Campbell as surety for Watson.

The question here is whether appellee was doing business in this state. We are of opinion that it was not. This same contract was before the court in J. R. Watkins Company v. J. W. Coleman et al. (Miss.), 110 So. 449, not reported in state reports; and J. R. Watkins Co. v.

Poag et al., 154 Miss. 222, 122 So. 473. The court held that it was a contract of sale, not a contract of agency: In C. I. T. Corporation v. Stuart (Miss.), 187 So. 204, the court held that a foreign corporation which sent agents into this state to solicit reserve title contracts and purchased such contracts at its office outside the state, was not doing business within the state within the terms of our statute requiring the appointment of process agent as a condition precedent to maintenance of suit. To the same effect are North American Mortgage Company v. Hudson et al., 176 Miss. 266, 168 So. 79; Dodds v. Pyramid Securities Co., Inc., et al., 165 Miss. 269, 147 So. 328. The requirement that sales be reported to the seller by the purchaser does not prevent the passing of the title, nor does a provision in the contract allowing the purchaser to return unsold goods, nor does the designation of the purchaser's sale territory. Dr. Koch Tea Company v. Malone, — Tex. Civ. App. —, 163 S. W. 662, 663. The recent decision in Case v. Mills Novelty Company (Miss.), 193 So. 625, not yet reported, throws light on the question.

Appellee seems to rely mainly on Wiley Electric Co. et al. v. Electric Storage Battery Company, 167 Miss. 842, 147 So. 773. That case is not in point on its facts. They were materially different from the facts in the present case. The foreign corporation involved in that case had been doing business in the state for more than ten years, over practically the entire state. Its contracts were usually executed within the state by travelling representatives "and local storeroom operators were urged if not required." Payments were regularly made by trade acceptances. The notes sued on were dated and executed and payable in this state. The retail prices at which the products were sold were controlled by the foreign corporation. The sale territory was fixed in the contract. The contract required further "such storerooms to purchase batteries at prices fixed by the appellee, and to carry in stock complete Exide batteries and parts, and to

actively canvass the battery trade 'within the trading area assigned by the battery company to the purchaser from time to time in conformity with the sales policies and methods prescribed by the battery company, and not to handle or sell any substitute for, or imitation of, Exide material.' It further provided that the purchaser should 'handle repairs or replacements under the Exide warranty in the manner and upon the terms prescribed by the battery company,' . . .''

Affirmed.