# MARTIN GRAF v. MONTGOMERY WARD & COMPANY, INC.[1]

July 6, 1951.

No. 35,500.

[1]Reported in 49 N. W. (2d) 797.

*Francis D. Roth* and *Doherty, Rumble, Butler & Mitchell,* for relator.

*G. W. Mantor* and *John T. O'Donnell,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Certiorari to review an order of the industrial commission affirming the findings of a referee allowing compensation and reducing the amount allowed by the referee for nursing services.

Martin Graf, respondent, was injured on August 19, 1949, when he fell from the roof of a residence in Minneapolis where he was engaged in installing a new roof.

The owner of the premises had contracted with Montgomery Ward & Company, relator, to replace the roof. It appears from the record that jobs such as that upon which respondent was engaged were secured by commission salesmen working out of relator's building material department. When a salesman called upon a prospect and obtained an order for a roofing job, the price quoted the purchaser included the necessary roofing material and the installation of the roofing. When a sale was made, the contract was reduced to writing on a four-page form prepared and furnished by relator. The first two pages of such form were identical. The third and fourth pages contained the same information as the first and second pages, except the information as to price, terms, and customer's acceptance. In addition, the third and fourth pages contained an installation agreement for signature by the installer. After the first page had been signed by the purchaser of the roofing, it was returned to relator's store and retained in its credit department. The second or duplicate page was sent to the customer. A work sheet was prepared and attached to the third page, and the third and fourth pages were then sent to relator's building material department.

Relator had made arrangements with some nine persons to do the actual roof installation work on jobs which it obtained, among whom was respondent. He had been doing installation work on jobs for which relator had furnished the material for about six

years. Relator contends that during this time respondent held himself out to the public as a roofing contractor; that from 1949 until the time he was injured he did roofing installation work on jobs other than those obtained by relator; and that on those other jobs respondent furnished both labor and materials.

It appears that when respondent was working on a job procured by relator he ordinarily would learn the location of the job by going to relator's store, where he would sign the installation agreement attached to the proposal slip and receive a work sheet, which indicated the location of the job, the amount of material involved, and other information necessary for a proper installation. Respondent would obtain these work sheets from whomever was in relator's office when he called. When the job was completed, he would fill out a completion slip, which he was supposed to have the customer sign. After the job was finished, it was inspected by relator. If any job description on a work sheet which respondent received was not clear, he would telephone relator's office or speak to its inspector to obtain a clarification of what the contract provided. Respondent received the money due him on each job he completed at relator's store, where he presented a voucher, obtained in the building material office, to the cashier. All materials on these jobs were supplied and delivered to the job site by relator, but respondent furnished his own tools, ladders, and scaffolding, which were transported by him from job to job in his own vehicle. Respondent testified that "On a couple of occasions" he had some workmen who were on their vacations help him "a little bit" and that he "split with them" what he got from relator on that particular job, but said that he did not employ anyone. He filed no federal income tax withholding slip with relator, nor did relator withhold any money for income tax purposes for money which was due respondent on jobs where he acted as installer or make deductions for federal social security tax purposes. It appears that respondent carried a public liability insurance policy, on which he paid the premiums and in which relator was named as an additional assured. Under the working arrangements with relator,

respondent took care of complaints on jobs which he installed if some adjustment or correction was necessary, and ordinarily he received no additional remuneration for that work. His pay for installing the roof was based on a figure of $2.50 per 100 square feet.

Respondent said that on the evening before the accident relator's assistant manager of the building material department, Frank H. Forester, telephoned him and asked him if he would go to a certain location in Minneapolis the next morning and install the roof job involved. He claims that he did not want to go on that job as he was busy, but that Forester insisted that he go the next morning, and "I gave in to him and went out." Forester did not recall whether he telephoned respondent or whether respondent called him that evening, although he admitted that it was necessary that the installation on this job be started without delay. In any event, respondent did go directly to the designated location from his home the next morning without first going to relator's place of business to sign any installation agreement or receive any work sheet. He claims that Forester told him, "You can sign it when you come in," and Forester admitted that respondent had not signed anything on this particular job. It appears also from the record that respondent arrived at the place where the roof was to be installed about 8:30 on the morning of August 19, 1949, for the purpose of doing the work, and that the materials necessary for the installation of the roof had been previously delivered to that location by relator. Respondent was working alone on the job, and about an hour after he commenced work he fell from the edge of the roof to the ground, a distance of about 30 feet. The fall rendered him temporarily unconscious. When he regained consciousness, he observed that firemen were working over him, and they put him into an ambulance. Mention was made that they were going to take him to General Hospital, Minneapolis, but he told them that he lived in St. Paul and that he wanted to go to Bethesda Hospital. He claims that one of the firemen then said that they had just received a call to take him to Miller Hospital. Respondent claims

that he was conscious while being taken to the hospital in the ambulance and that when he arrived at Miller Hospital Forester and Steven J. Callahan, an inspector for relator, were there awaiting him, as well as a Dr. Lannin, a stranger to respondent, who at once took over the care of the injured man. Forester testified that he believed Dr. Lannin had been summoned by relator's medical department.

The referee found that respondent was employed in the capacity of a roofer by relator under a Minnesota contract for hire at a five-day weekly wage of $110.12; that relator was an authorized self-insurer under the workmen's compensation law; that respondent suffered an injury on the date in question which arose out of and in the course of his employment; and that relator had statutory notice and knowledge of the accident. The referee further found that as a result of the accident respondent necessarily incurred medical expense totaling $227, hospital and therapy expense totaling $191.30, and practical nursing expense to Dorothy Graf, wife of respondent, in the sum of $933, all of which was unpaid except $150.30 due Miller Hospital, which respondent paid; that as a result of the accident respondent was temporarily and totally disabled for a period of 41 weeks and temporarily partially disabled for 3 3/5 weeks; and that in such partially disabled condition he was able to earn $55.06 a week. He also found that as a result of the accident respondent suffered a 20 percent permanent disability of his back, and awarded him compensation amounting to $1,338, with interest. He further ordered that relator afford respondent such additional medical and other treatment as might be reasonably necessary to cure and relieve him from the effects of the accident, together with compensation at the weekly rate of $30, or such other rate per week as his disability might warrant, from and including June 28, 1950, subject to the provisions and limitations of the workmen's compensation act. He also ordered relator to reimburse respondent for the medical, hospital, and nursing items above referred to and that relator pay the industrial commission $36 for the benefit of the special compensation fund.

Relator appealed to the industrial commission from the findings and decision of the referee. The commission, one member dissenting, approved and adopted the referee's findings as the findings of the commission, with the exception of the amount allowed respondent's wife for practical nursing services, which it reduced from $933 to $372.

Relator assigns as error that the finding of the commission that respondent was in the employ of relator at the time of his injury is unwarranted by the evidence; that the order to pay respondent's wife the sum of $372 is not in conformity with the terms of the compensation act and is unwarranted by the evidence; that the commission erred in affirming the findings of fact and award of the referee; and that the findings and award as adopted and approved by the commission are unwarranted by the evidence and contrary to law.

The questions for our consideration on review are these:

(1) Was respondent an employe of relator or was he an independent contractor?

(2) Under the workmen's compensation act, is the employer liable for the reasonable value of practical nursing services furnished an injured employe in his own home by his wife where the wife has not given up other employment to administer to her husband?

■ The findings of the industrial commission are entitled to great weight, and this court will not disturb them unless they are manifestly contrary to the evidence; and if, after an impartial consideration of the evidence and of the inferences which may fairly and reasonably be drawn therefrom, reasonable minds might reach different conclusions upon the question, the findings must stand. Peterson v. State (Operating University Hospitals), 234 Minn. 81, 47 N. W. (2d) 760; Rinne v. W. C. Griffis Co. 234 Minn. 146, 47 N. W. (2d) 872; Tometz v. Biwabik Min. Co. 171 Minn. 302, 213 N. W. 897; Fisher v. Fisher, 226 Minn. 171, 32 N. W. (2d) 424. It is also the well-established policy of this court that the workmen's compensa-

tion act must be given a broad construction in the interest of workmen to carry out its policy. 6 Dunnell, Dig. & Supp. § 10385. In reviewing the findings of the industrial commission, our function is not to determine whether on the facts the decision of the commission is correct, or even preferable to another, but rather, and only, to determine whether the findings have sufficient basis of inference reasonably to be drawn from the facts. 6 Dunnell, Dig. & Supp. § 10426; Fisher v. Fisher, *supra.*

It is our opinion, viewing the record before us in its entirety, that the evidence in connection with the question whether respondent was an employe or an independent contractor was such that the commission might reasonably make the order or determination which it did. The issue whether a person is an employe or an independent contractor is frequently a difficult one. No general rule can be laid down which covers all situations. Each case must depend to a great extent upon its own particular facts. In determining whether the relationship is one of employe or independent contractor, the most important factor is the right of the employer to control the means and manner of performance. Other factors to be considered are mode of payment, furnishing of materials or tools, control of the premises where the work is to be done, and the right of the employer to discharge the employe. Lemkuhl v. Clark, 209 Minn. 276, 296 N. W. 28; Herron v. Coolsaet Bros. 158 Minn. 522, 198 N. W. 134; Bosel v. Henderson Holding Co. 167 Minn. 72, 208 N. W. 421; 12 Minn. L. Rev. 83.

Restatement, Agency, § 220, states in part:

"(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

"(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

"(b) whether or not the one employed is engaged in a distinct occupation or business;

"(c)   the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

"(d)   the skill required in the particular occupation;

"(e)   whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

"(f)   the length of time for which the person is employed;

"(g)   the method of payment, whether by the time or by the job;

"(h)   whether or not the work is a part of the regular business of the employer; and

"(i)   whether or not the parties believe they are creating the relationship of master and servant."

The test most emphasized in the determination of this question is the right of control. Castner v. Christgau, 222 Minn. 61, 24 N. W. (2d) 228.

It is our opinion, after an impartial consideration of all the evidence in the case before us and of the inferences which clearly and reasonably may be drawn from this evidence, that the decision of the commission that on and prior to August 19, 1949, respondent was an employe of relator must be affirmed.

While it is not necessary for us to review in this opinion all the testimony in order to sustain our position, a brief summary of the fact situation here satisfies us that respondent could well be considered an employe of relator at the time the accident happened. Relator's salesman took the order from the customer in the first place. It is reasonable to assume that part of the sales talk in connection with the solicitation of business from the prospective customer was to the effect that relator would not only supply the materials, but would perform the installation and inspect the job after it was completed to insure the purchaser that the work was done in a satisfactory manner. There seems to be every inference that relator controlled the performance of the job. If it was not done to the satisfaction of relator after an inspection, the latter required respondent to make the necessary adjustments or correc-

tions, ordinarily without additional remuneration. There is nothing in the record to show that the purchaser had anything to do with the selection of respondent to perform the work, nor that he relied upon respondent in any way. His contract was entered into with relator, and if the work was not done to his satisfaction he had the right to complain to relator. Respondent had been doing this kind of work for relator for about six years. When an urgent call came for the performance of a job, as in the instant case, respondent apparently set aside other plans which he may have had in order to comply with relator's instructions and directions. Every inference which may be drawn from the evidence here sustains our conclusions that respondent was an employe of relator at the time the accident occurred.

In connection with the second question, whether relator is liable for the reasonable value of nursing services furnished by the spouse of an injured employe, M. S. A. 176.15 provides in part:

"The employer shall furnish such medical, surgical, and hospital treatment, including nursing, medicines, medical and surgical supplies, crutches and apparatus, including artificial members, as may reasonably be required at the time of the injury, and during the disability, to cure and relieve from the effects of the injury. In case of his inability or refusal seasonably to do so the employer shall be liable for the reasonable expense incurred by or on behalf of the employee in providing the same. * * *

* * * * *

"The pecuniary liability of the employer for the treatment, articles, and supplies herein required shall be limited to such charges therefor as prevail in the same community for similar treatment, articles, and supplies furnished to injured persons of a like standard of living, when the same are paid for by the injured persons. The commission may on the basis above stated determine the reasonable value of all such service and supplies, and the liability of the employer shall be limited to the amount so determined."

It appears from the record here that because of the nature of respondent's injuries a full plaster body cast was applied after he

was admitted to the hospital. On the fifth day he was taken home, where he was confined to bed for about a month, still under a doctor's care. Respondent testified that after this bed confinement he could get up and walk around just to eat, but that he was in a cast from his neck to his hips. This cast was removed about December 24, 1949. He said that he was still confined to his home until about the time of the hearing in May 1950, and that he was then wearing a brace. After respondent returned to his home from the hospital on August 24, his wife undertook to provide the nursing care he required while incapacitated and confined to his home. Previous to that time, during the 12 years of their married life, Mrs. Graf acted as a housewife and had not engaged in employment outside their home. The nursing service rendered her husband while confined to his bed consisted primarily of bathing the patient once or twice a day, serving meals to him in bed, helping him back and forth to the bathroom three or four times during each 24-hour period, administering drugs and medication at prescribed intervals, massaging his leg frequently to stimulate circulation, and generally remaining close at hand in order to attend to his needs and necessities. After passing the first month in bed, respondent appears to have been able to be out of bed each day for 15 or 20 minutes in the morning and a similar period later in the day. This involved Mrs. Graf's getting him dressed as best she could under the circumstances, and other care. On September 28, 1949, she secured daytime employment for a five-day week in a store in downtown St. Paul, which necessitated her leaving home at 7:15 a. m. and returning about 5:30.

The referee allowed Mrs. Graf nursing services in the sum of $933, apparently based on the four-month period from August 24, 1949, when respondent returned home from the hospital, until December 24, 1949, when the body cast was removed. On appeal to the commission, the award for such services was modified to cover only the first month of bed confinement.

Relator contends that, even assuming for the purpose of argument that the commission was warranted in finding that an em-

ployer-employe relationship existed between relator and respondent at the time of the latter's injury, nevertheless the commission exceeded its legal authority in ordering relator to pay respondent's wife the reasonable value of practical nursing services which she rendered to her husband.

We agree with relator's contention in this respect, since we are bound by the provisions of the statute, which specifically provide that an employer shall be liable for the reasonable expense incurred by or on behalf of the employe in providing nursing care. There is nothing in the record before us to indicate or prove that any expense was incurred by or on behalf of respondent in providing the nursing services of his wife or that she was forced to give up other remunerative employment in order to render such services. In fact, it appears from the record that Mrs. Graf was never engaged in employment outside her home during her 12 years of married life until after her husband had been confined to his bed for a month after the accident. It is elementary that a husband is not liable to his wife for the reasonable value of her services in performing the usual tasks of a housewife and mother. While we recognize that Mrs. Graf appears to have been a dutiful and faithful wife and mother and that her duties during the month when her husband was confined to his bed were not always the normal duties of a housewife in maintaining and keeping up her home, we are still confronted with the language of the statute that the employer shall be liable only for the reasonable expense incurred by or on behalf of the employe in providing nursing service. With no showing of any such expense incurred by respondent or that his wife was forced to give up other remunerative employment, we hold that the evidence does not sustain the finding of the commission with reference to the matter of allowance for nursing services to respondent's wife. 1 Honnold, Workmen's Compensation, § 200; 2 Schneider, Workmen's Compensation Law (2 ed.) § 492; Galway v. Doody Steel Erecting Co. 103 Conn. 431, 130 A. 705, 44 A. L. R. 693; City of Milwaukee v. Miller, 154 Wis. 652, 144 N. W. 188, L. R. A. 1916A, 1.

It is possible that in the instant case the commission applied the rule in negligence cases, to the effect that one who is entitled to recover special damages for nursing in a personal injury action may recover the reasonable value thereof even though the nursing was rendered gratuitously by a member of the family. Wells v. Minneapolis B. & A. Assn. 122 Minn. 327, 142 N. W. 706, 46 L.R.A. (N.S.) 606; see, also, Dahlin v. Kron, 232 Minn. 312, 45 N. W. (2d) 833. That rule is based not on statutory liability, but on the common-law principle that one who tortiously injures another in his person or property incurs a legal liability to make good to the other all the loss which is directly and naturally caused by the tort, and thus cannot reduce the amount of the recovery by taking advantage of the gratuitous services of family or friends. The distinction here is that we are dealing with a statutory requirement under the workmen's compensation act, where respondent's rights are not grounded on the negligence of relator, but on the provisions of the compensation act. Any right to recover for nursing services such as in the case at bar must be granted by the legislature and not by the courts, since we are compelled to interpret the law as it appears on the statute books.

The decision of the commission is affirmed on the question of respondent being an employe and reversed on the question of allowance of nursing services to his wife.

Respondent is allowed $250 attorneys' fees.

UPON APPEAL FROM CLERK'S TAXATION OF COSTS.

On October 19, 1951, the following opinion was filed:

Workmen's compensation—proceedings—costs—prevailing party.

PER CURIAM.

Both parties have attempted to tax costs and disbursements. The clerk taxed costs and disbursements for relator and refused to tax any disbursements for respondent except the $250 attorneys' fees allowed him in our decision filed herein on July 6, 1951. Respondent has appealed from the taxation in favor of relator.

In this case, the proceedings were to review an order of the industrial commission allowing compensation and reducing the amount allowed by the referee for nursing services. We affirmed the decision of the commission on the question of the allowance of compensation, but reversed on the question of allowing nursing services to respondent's wife. Both matters were disposed of in one order of the commission. No issue was raised on this appeal as to whether relator's disbursements as taxed were necessary to the presentation of this appeal, nor was any attempt made to separate the disbursements in the compensation matter from those in the nursing matter. Respondent simply appealed from the taxation in favor of relator. The sole issue for determination is who was the prevailing party.

It is our opinion that relator is the prevailing party, inasmuch as it obtained a modification of the commission's order. Krusemark v. Krusemark, 232 Minn. 416, 46 N. W. (2d) 647. M. S. A. 607.01 authorizes this court in its discretion to allow costs not exceeding $25 to the prevailing party, and "In all cases the prevailing party shall be allowed his disbursements necessarily paid or incurred." Respondent raises the question whether the disallowance by this court of a single item such as the $372 allowed his wife by the commission for nursing services is sufficient to constitute relator the prevailing party on certiorari. He does not dispute that in several decisions this court has determined that an appellant obtaining a modification of a judgment below has been held to be the prevailing party so as to entitle such appellant to tax his costs and disbursements incidental to his appeal.

We can see no reason why the rule should be different in certiorari from that of a modification on appeal of a judgment or order. In this case, there was quite a substantial modification of a single order of the commission. In Henderson v. Northwest Airlines, Inc. 231 Minn. 503, 511, 43 N. W. (2d) 786, 792, involving an appeal from a district court order, this court said: "An appellant is the prevailing party if the judgment or order from which the appeal was taken is reversed or is modified." We appear to have no dis-

498

cretion under the act but to allow the prevailing party its disbursements necessarily incurred. Collins v. Collins, 221 Minn. 343, 348, 22 N. W. (2d) 168, 23 N. W. (2d) 9, 10; Krusemark v. Krusemark, *supra.*

It is our opinion that relator should be allowed its disbursements and that respondent's attorneys should be allowed $250 attorneys' fees.