JENNIE GEERDES v. J. R. WATKINS COMPANY
AND ANOTHER.

103 N. W. (2d) 641.

June 10, 1960—No. 37,926.

*Brehmer & McMahon* and *McLeod & Gilmore,* for relators.
*Benjamin Vander Kooi,* for respondent.

KNUTSON, JUSTICE.

Certiorari to review a decision of the Industrial Commission award-
ing compensation to the dependents of a decedent allegedly employed
by one of the relators.

Relator the J. R. Watkins Company is a manufacturer and whole-
saler of various household products and farm supplies. The home office
of the company is at Winona, Minnesota. It has manufacturing plants
in that city and in Memphis, Tennessee; Montreal and Winnipeg,
Canada; Spring, South Africa; Melbourne, Australia; and Wellington,

New Zealand. Its products are sold in every state of the Union, including Alaska and Hawaii, and in every province in Canada, as well as in Australia and New Zealand, the Union of South Africa and Rhodesia, and in parts of the Caribbean Islands. It employs about 1,250 people in its manufacturing plants and in some 25 sales offices and warehouses. The company products are sold to independent dealers or to independent distributors, who, in turn, sell to retailing dealers. There are about 320 of such distributors in the United States and Canada, located in the larger cities, such as the Twin Cities and Duluth in Minnesota. Altogether there are about 15,000 dealers. Of these, some 3,600 dealers in the United States and Canada purchase directly from the company, and some 9,000 purchase from distributors. In rural areas, the products are sold directly to dealers. The company does not sell any of its products at retail and has no fixed retail prices on its products, except at a store in Winona where it is done for the convenience of employees only.

Petitioner's decedent, Raymond Geerdes, started in business as a rural Watkins dealer in 1920, when he bought all of the stock of a former dealer, George Schultz. He then entered into his first contract with the Watkins company by which sureties guaranteed the payment of his purchases from the company. When he purchased the Schultz merchandise for $660.97, both he and Schultz signed a transfer form authorizing the company to charge Geerdes' account and credit Schultz' account, which was done. From the time of the purchase of the Schultz merchandise until the date of his death, December 28, 1955, Geerdes continued doing business with the Watkins company under the terms of a contract, which was renewed from time to time until September 1, 1933. The last contract under which he operated, entered into on that date, reads:

"THIS AGREEMENT, Made at Winona, Minnesota, this 1st day of September, 1933 between THE J. R. WATKINS COMPANY, a corporation, hereinafter called 'the Company,' Raymond Geerdes of Edgerton, Minnesota, hereinafter called 'the Purchaser,' and THE WINONA NATIONAL AND SAVINGS BANK, hereinafter called 'the Bank,' witnesseth,

"1.   That in consideration of the promises and Agreements of the Purchaser hereinafter contained, to be kept and performed by him, the Company agrees, unless prevented by fire, strikes, or other cause, to sell and deliver to the Purchaser, at its current wholesale prices, free on board cars at Winona, Minnesota, or at its option, at any of its other regular places of shipment, such goods and other articles manufactured or sold by it, as the Purchaser may reasonably require for sale, for a term commencing the date hereof and continuing until terminated by any of the parties hereto, as hereinafter provided, in the locality in which he is now engaged, or intends to engage, in business, a description of which locality he agrees to furnish and deliver to the Company in writing prior to its acceptance of this agreement; but the furnishing of such description may be waived by the Company at its election, without notice to the Purchaser or the Bank.

"2.   And in consideration thereof, the Purchaser agrees to buy from the Company the goods reasonably required by him as aforesaid; and agrees to furnish to it complete, regular, weekly, written reports, showing separately the amounts of his cash sales, time sales, and collections; which reports, however, or any of them, may be waived by the Company, and he also agrees to furnish a complete financial statement when requested to do so.

"3.   The Purchaser further agrees to pay the Company its current wholesale prices for the goods and other articles sold to him, as herein provided, and also the prepaid transportation charges thereon, if any, by remitting to the Company each week at least sixty per cent (60%) of the amount received by him from his cash sales, and from his collections on sales previously made, at the time and in the manner and in accordance with the provisions of the weekly report blanks of the Company to be furnished to him; and, at the expiration or termination of this Agreement, to pay the whole amount therefor then remaining unpaid; or the Purchaser may pay for such goods in cash, less the usual cash discount allowed for such payments; but such payments, or any of them, may be waived or extended by the Company without prejudice to its rights or interests.

"4.   If the Purchaser shall not pay cash for said goods and other

articles so sold and delivered to him, and the payments at the time and in the manner hereinbefore provided are insufficient to pay therefore, or if the Purchaser shall fail to pay from time to time on the indebtedness now due, amounts satisfactory to the Company, the Company may, in its discretion, thereafter either limit the sales herein agreed to be made, or discontinue the same, or require cash with each order, or cash upon delivery, until the Purchaser's indebtedness is paid, or reduced, as the Company may require.

"5. And to secure the payment of such indebtedness, and for the goods, and any transportation charges thereon, the Purchaser deposits* with the Bank, at the time of the delivery of this agreement, the sum of Five Hundred ($500.00) Dollars, which the Bank agrees to receive and hold in trust as security for the payment of any indebtedness, now due, or which may hereafter become due from the Purchaser to the Company; and, in case of default in the payment of the indebtedness hereunder, at the time provided herein, the Purchaser hereby authorizes and directs the Bank, and the Bank hereby promises and agrees, to pay to the Company the said sum, with any accrued interest thereon, or so much thereof as shall be necessary to pay all indebtedness then due hereunder, the amount of which shall be determined by the oath of an officer of the Company verifying the same, and to pay any remaining balance thereof to the Purchaser; and the Company guarantees the payment of any such remaining balance by the Bank to the Purchaser.

"6. The payment of such sum, as provided above, shall constitute and be a full release, satisfaction and discharge of the Bank from any and all liability or responsibility hereunder, it being expressly agreed, by and between all the parties hereto, that the Purchaser, his heirs, executors or administrators, shall have no power or authority to control, assign, transfer, incumber, or withdraw said deposit, or any part thereof, until the indebtedness due the Company under this agreement has been fully paid; and that, until such payment, the said sum shall be held by the Bank in trust as security for the payment thereof. And, if the Purchaser's deposit shall be held by the Bank for six months or more, the Bank agrees to pay interest thereon at the rate of three

(3%) per cent per annum on the first days of January and July of each year; or, in case of the termination of this Agreement by any party thereto, the Bank agrees to pay such interest until the end of the month preceding such termination, but no interest shall be payable for parts of a month.

"7. The Purchaser may, within thirty days after the termination of this agreement, return, by prepaid freight, to the Company, at Winona, Minnesota, Memphis, Tennessee, Newark, New Jersey, or Oakland, California, in as good condition as when delivered to him at point of shipment, any goods purchased by him from the Company, which he may then have on hand; and the Company agrees to accept such goods, if in such condition when received by it, and pay or credit the Purchaser therefor at the then prevailing wholesale prices. And, if the goods returned by the Purchaser are not in a salable condition, when received by the Company at any of the places above named, the Company will restore them to such condition, if that can reasonably be done, making a reasonable charge therefor, and deduct such charge from the value of such goods, and pay or credit the Purchaser with the balance. But the Purchaser shall not return, nor the Company allow any credit for, any advertising matter of any kind, or for any goods or articles which have been used, or for any goods which cannot reasonably be restored to a salable condition.

"8. The Purchaser shall have no power or authority to make any statement or representation in the name of the Company; or to incur any debt, obligation, or liability of any kind whatsoever in the name of, or for, or on account of the Company. And the Company shall have no interest in the accounts due for goods sold by the Purchaser.

"9. It is mutually agreed that no printed, advertising, or other matter of the Company, sent to, or distributed by, the Purchaser, shall be construed to direct or control the sale, or other disposition, of the goods sold by the Company to the Purchaser, or to change or modify the terms of this Agreement; and that this is the complete, entire, and only agreement between the parties, and that it shall not be varied, changed, or modified in any respect except in writing executed by the parties hereto.

"10. Any of the parties hereto may terminate this Agreement at any time by giving the other parties notice thereof in writing by mail; and any indebtedness then owing by the Purchaser to the Company shall thereupon become immediately due and payable, and shall be paid by the Bank out of the Purchaser's deposit, and the balance of such deposit, if any, shall be refunded to the Purchaser, as provided above.

"IN WITNESS WHEREOF, the Company and the Bank have caused these presents to be executed in their corporate names by their proper officers, and the Purchaser has hereunto set his hand the day and year first above written.

\*    \*    \*    \*    \*

"\*The Deposit must be made by Bank Draft payable in New York or Chicago to the order of 'The Winona National and Savings Bank.' "

Operating under the above contract, Geerdes ordered goods from the company on prescribed order forms. The goods were sold to him at wholesale prices and were shipped to him from Winona. He resold the goods in Rock County or Edgerton at retail prices and kept the difference as his profit. He alone decided what goods he wanted and ordered them from the company. Each month the company sent him a statement, which was a copy of his ledger account, showing the balance which he owed and which he then verified. The contract under which he operated is a standard form of rural dealers' contract under which some 3,600 dealers who purchase their merchandise directly from the company operate and is similar to the contract under which some 9,000 dealers purchase goods from independent distributors to whom the company sells.

While Geerdes, under the terms of his contract, agreed to report the amount of his retail sales and send the company weekly at least 60 percent of his cash receipts to apply on his account if he did not pay in cash, he customarily paid monthly in order to receive a 2-percent discount, as any dealer could do if he saw fit. His monthly balance fluctuated from $700 to $1,800. Upon his death he had a stock of goods worth over $4,700, which was inventoried as an asset of his estate. This stock was not sent back to the company for re-

purchase, as it could have been. Part of it was sold by his administrator to another Watkins dealer, and the company debited the other dealer's account and credited Geerdes' account, in the same manner as when Geerdes originally bought stock from Schultz when he began selling Watkins products. For the amount owed Geerdes when this transaction was completed, the company paid Geerdes' administrator in cash, and the bank refunded his cash deposit to the administrator with interest. The unpaid accounts which Geerdes had outstanding at the time of his death were collected by the administrator of his estate or by his wife. The company had nothing to do with the collection of these accounts.

For the nearly 36 years that Geerdes sold Watkins products in Rock County he sold about everything that the Watkins company made, which consisted of about 300 different products. These products changed over the years but consisted mainly of household products, farm supplies, and toilet articles. Geerdes had an office in his home and kept his own books, such as a record of retail sales and a salesbook of his individual sales for his own purposes, none of which information was required by or transmitted to the company. He did his own advertising by circulars which he sent out to his customers and by newspaper advertising and a stamp on his sales slips. He also carried a sign on his car or station wagon, all at his own expense and discretion.

During the time that Geerdes was buying these products, the company sold him goods on his written order, f. o. b. Winona. He paid the freight to Edgerton. He had a stockroom in a separate building at his home in which he stored the household goods on shelves. The farm line products were stored in a smaller building. He owned his own station wagon or automobile, which he used in his business, and carried his own insurance on it.

Geerdes regulated his own hours of work but usually went out on the route at 9:30 in the morning and returned about 5 o'clock in the evening. He took a vacation when he wanted to, although he customarily notified the company in advance when he was going on vacation. While the company suggested the retail price on the products, the dealer was

not bound by it. He could sell at any price that he chose to fix. Sometimes he would give a discount to friends and relatives. At no time did he ever report to the company who his customers were, and he never sent his salesbooks to the company. He extended credit if he saw fit to do so, and the accounts receivable belonged to him. He collected and paid the luxury tax on cosmetics himself. Occasionally he hired help in the storeroom or for delivering, and the family helped him, but no report was ever made to the company of these activities. No employee of the company ever traveled with him on his route.

On occasions the company representatives would hold meetings in the area in which Geerdes worked, which were usually attended by the dealers operating in that area. They were not required to attend, and, if they did so, they paid their own expenses. The purpose of these meetings was to acquaint the dealers with new products and generally to assist them in their selling operations.

To a limited extent the territory in which a dealer could operate was regulated by the company. When a dealer first began operating he informed the company of the territory in which he intended to sell. In order to prevent conflicts with other dealers, the agreement with a new dealer was not entered into until it was known that he did not intend to compete with other dealers already operating. From time to time the territory of a dealer was reduced or enlarged by agreement with the company. Geerdes paid all expenses of operating his business. His income tax returns were made out showing that he was a self-employed person, and he paid a social security tax as such. As business expenses he deducted postage, advertising, light and fuel for his warehouse, telephone, exchange on checks, and car expenses. After his death his administrator, who is his widow's attorney in this proceeding, filed his income tax return for 1955 in the same way.

After his death, a part of the stock of merchandise on hand was sold to a new dealer, as has been stated above, and the balance was sold by the administrator or by his wife in any manner in which they saw fit.

On December 28, 1955, Geerdes left on his route as he had customarily done each day. He was found lying by his car later in the

day and apparently had died from a coronary insufficiency or occlusion. In view of our decision on the merits in this case, it is not necessary to discuss the medical aspects of his death or the causal relationship between his death and his employment.

The only question we need consider in the disposition of this case is whether Geerdes, on the date of his death, was an employee of the Watkins company within the meaning of our Workmen's Compensation Act.

■ The rules applicable to a determination of whether a person is an employee or an independent contractor in the field of workmen's compensation presents no serious difficulty. Application of the rule to given facts often does, and for that reason we have frequently said that no formula can be devised that will fit the facts in each case with mathematical precision. In a large measure each case must be determined on its own facts. The distinction between an employee and an independent contractor may be said to consist largely in the difference between one who undertakes to achieve a given result under an arrangement with another who has authoritative control over the manner and means in which and by which the result shall be accomplished and one who agrees to achieve a given result but is not subject to the orders of another as to the method or means to be used.[1] While the right to terminate the arrangement is an important factor in determining the relationship of the parties,[2] it alone is not conclusive. The right of the company to terminate the agreement here amounted to nothing more than the right to decline to sell any more products to the

[1]Nesseth v. Skelly Oil Co. 176 Minn. 373, 223 N. W. 608; Olson v. Eck's Homemade Sausage Co. 194 Minn. 458, 261 N. W. 3; Korthuis v. Soderling & Sons, 218 Minn. 342, 16 N. W. (2d) 285 (many of our prior cases are here collected); see, also, Koktavy v. City of New Prague, 246 Minn. 550, 75 N. W. (2d) 774; Graf v. Montgomery Ward & Co. Inc. 234 Minn. 485, 49 N. W. (2d) 797; Christopherson v. Security State Bank, 256 Minn. 191, 97 N. W. (2d) 649; Salmond, Law of Torts (10 ed.) § 26, p. 84; Pollock, Torts (15 ed.) p. 62; Prosser, Torts (2 ed.) § 64; Restatement, Agency (2 ed.) § 220, and comment *c;* Matter of Morton, 284 N. Y. 167, 30 N. E. (2d) 369.

[2]Korthuis v. Soderling & Sons, 218 Minn. 342, 16 N. W. (2d) 285.

dealer. In commenting on the right, the Washington court said in White v. J. R. Watkins Products Co. 1 Wash. (2d) 466, 474, 96 P. (2d) 456, 460:

"* * * The respondent [Watkins Co.] could, of course, cancel his agreement on written notice and decline to sell him any more of its products if he did not conform to its policy; but the goods in his possession at all times belonged to him. While the respondent might refuse to make further sales to him, it could not control his disposition of the merchandise he had paid for."

The same is true here. The dealer could continue to sell the products he had purchased exactly the same after termination by the company as before, as long as his stock of merchandise lasted. It may become determinative where the right to terminate forces compliance with the master's directions as to the method and manner of performance.[3]

The rule we follow in determining whether an employer-employee relationship exists is largely the common-law rule.[4]

Many of our cases relied upon by petitioner are distinguishable on the ground that they involved largely personal services of an alleged employee.[5] In the case now before us that is not true. It is admitted that the Watkins products were sold to the dealer at wholesale prices. If he paid by the twentieth of the month he was granted a 2-percent discount. He accepted delivery f. o. b. Winona, and the products became the property of the dealer. While the Watkins company recommended a retail price, the dealer was not bound by it but could sell at any price he wished; he could give the product away or destroy it if he saw fit. He maintained his own stockroom. While the contract could be terminated by either party, the dealer could continue to sell as long as the stock he had on hand lasted. The right to terminate the contract consisted only of the right to refuse to sell more products to the dealer.

---

[3]Cf. Matter of Electrolux Corp. 288 N. Y. 440, 43 N. E. (2d) 480.

[4]Castner v. Christgau, 222 Minn. 61, 24 N. W. (2d) 228; Angell v. White Eagle Oil & Refining Co. 169 Minn. 183, 210 N. W. 1004; Graf v. Montgomery Ward & Co. Inc. 234 Minn. 485, 49 N. W. (2d) 797.

[5]Nesseth v. Skelly Oil Co. 176 Minn. 373, 223 N. W. 608; Korthuis v. Soderling & Sons, 218 Minn. 342, 16 N. W. (2d) 285.

In addition, the dealer could sell on credit, and, when he did so, the accounts receivable were his own. He paid the wholesaler for the products purchased whether he collected from the consumer to whom he sold or not. When he died, the stock of merchandise on hand was inventoried as part of his estate. When he began selling Watkins products he bought the stock of the former dealer, and when he died part of the stock he had on hand was sold to a new dealer. He filed his income tax as a self-employed person and paid social security taxes as such. He determined when and where to work, within the limitations of his contract, and decided for himself when to take a vacation. These facts clearly point to a vendor-vendee relationship.

Petitioner relies on some things which a dealer was required to do as establishing the necessary control over the method and manner of performance of his contract. Among these is the fact that the company required weekly reports of his activities. It suggested a retail price, but, as we noted above, the dealer was not bound by such suggestions. Much is made of the fact that the territory within which he could operate was controlled by the company and that such territory was reduced from time to time by the company. However, it is apparent that the purpose of attempting to control the territory was to prevent one dealer from interfering with another, and it was not an absolute control. The company made suggestions as to the number of calls the dealer should make in a day and how he should present information to prospective purchasers of the nature of the product sold. It held meetings conducted by employees of the company at which new products were explained and selling methods advocated. Meetings were generally attended by dealers, but attendance was not compulsory, and the dealer paid his own expenses if he did attend.

While some of the activities of the company might point toward an employer-employee relationship, when the entire activities of the dealer and the company are considered it is apparent that what the company did was for the purpose of assisting the dealer as much as it could in improving his selling methods or for the purpose of establishing credit. The credit limitation granted to a dealer was based largely on his weekly reports. From these reports the company ascertained how much

credit could justifiably be advanced. Where dealers purchased from distributors, no records or reports were required except such as might be required by the distributor.

It seems clear to us that Geerdes was a vendee and not an employee. He ran the business as his own, and whatever control the company had did not affect the manner or means by which he conducted his business. Contracts of identical or similar nature have been considered by the courts of many states for one reason or another. In practically all of them it has been held that they create a relationship of vendor and vendee and not of employer and employee.[6]

We are convinced that the Industrial Commission incorrectly construed this contract as creating the relationship of employer and employee. The evidence is conclusive that the relationship was that of vendor and vendee.

Reversed.

----

[6]See, e. g., White v. J. R. Watkins Products Co. 1 Wash. (2d) 466, 96 P. (2d) 456; Watson v. J. R. Watkins Co. 188 Miss. 435, 193 So. 913; J. R. Watkins Co. v. Brund, 160 Wash. 183, 294 P. 1024; Sinnett v. J. R. Watkins Co. 214 Ky. 76, 282 S. W. 769; J. R. Watkins Co. v. Waldo, 117 Kan. 250, 230 P. 1051; J. R. Watkins Co. v. Salyers, 384 Ill. 369, 51 N. E. (2d) 574; Wright v. J. R. Watkins Co. 86 Ind. App. 695, 159 N. E. 761; J. R. Watkins Medical Co. v. Holloway, 182 Mo. App. 140, 168 S. W. 290; J. R. Watkins Medical Co. v. Hogue, 138 Ark. 105, 210 S. W. 628; J. R. Watkins Co. v. Rachal (La. App.) 31 So. (2d) 871; J. R. Watkins Co. v. Goudeau (La. App.) 63 So. (2d) 161; W. T. Rawleigh Medical Co. v. Ellis, 132 Ark. 421, 201 S. W. 110; W. T. Rawleigh Co. v. Tiffin, 200 Ark. 427, 139 S. W. (2d) 252; W. T. Rawleigh Co. v. Harper, 173 Wash. 233, 22 P. (2d) 665.