RICHARD T. JAMES v. W. V. PETERSON, d. b. a. NORTHERN PINE LODGE, AND ANOTHER.[1]

January 2, 1942.

No. 32,952.

[1]Reported in 1 N. W. (2d) 844.

*Bowen & Bowen,* for relator.
*Charles L. Clark,* for respondent.

HOLT, JUSTICE.

For many years relator has owned and operated a summer resort on Potato Lake, near Park Rapids, Hubbard county, this state. In the summer season, when the resort is open, relator may have up to 18 persons in his employ. The winters relator and his family have of late spent in Florida, and in 1938-1939 he was there operating a winter resort. He and his wife left for Florida about September 25, 1938, and did not return until some time in the spring following. When he left in the fall his son Robert remained until December 14, when respondent, who had been employed as caretaker, moved into one of the cottages. His wages were $25 a month and use of the cottage, and 25 cents an hour for any work he was directed to do aside from that of caretaker— seeing that the cottages were not broken into or the property of the resort disturbed or stolen. When Robert left on December 14 he paid respondent for the extra work the latter had performed up to that time.

The caretaker usually helped to cut the ice and fill the resort's icehouse, and that of one Head, of Waterloo, Iowa, after he, about 1930, became the owner of a summer home on Potato Lake, a short

distance east of relator's resort. Some time before leaving in September 1938, relator engaged Earl Ricker to put up the ice. Ricker owned a team, and relator's ice had to be hauled a short distance. Head's icehouse was so close to the lake that the ice could be slid into it without hauling. Respondent and Ricker had filled the two icehouses the seasons of 1935-1936 and 1936-1937, someone else in 1937-1938. About a week before Christmas 1938, respondent met Ricker on the road and was informed that Ricker had obtained employment with his team with the WPA, and he might not be able to put up the ice. A week or so later, respondent, Ricker, and one Saxton, at an entertainment in the schoolhouse, had a conversation with regard to this ice cutting, and respondent claims that the result thereof was that Ricker could not do it, therefore Saxton and respondent would. Theretofore the ice had been cut with a handsaw, but Saxton had a circular saw operated by a Ford. In relator's tool house were the handsaw, tongs, slide, and equipment needed for cutting and filling the icehouse. Before relator left for Florida, Saxton solicited the ice-cutting job, but was refused. On December 30, 1938, respondent had ascertained that the ice had attained sufficient thickness for cutting and so notified Saxton. He also cleaned both icehouses and shoveled the snow from the ice to be cut in front of relator's icehouse and in front of Head's. About two in the afternoon of that day Saxton came, and he and respondent started cutting the ice at Head's. Soon after beginning, something went wrong, the saw flew to pieces, and the rig struck respondent, breaking his leg. Saxton was instantly killed.

The commission adopted the decision of the referee, who found that on December 30, 1938, respondent was in the employ of relator under a Minnesota contract of hire, and that on said date respondent sustained an accidental injury to his person arising out of and in the course of the said employment. These two findings are challenged by the assignments of error as unsupported. They are both findings of fact, are decisive of the proceeding, and may well be discussed together.

Had the accident happened while cutting the ice destined for relator's icehouse, there could be no doubt of relator's liability under the workmen's compensation act. Respondent was hired by relator as caretaker at a certain wage and also to perform such extra work as he was directed to do at a certain price per hour. Cutting ice for relator's icehouse would be upon relator's premises. It was not a casual job, but one annually occurring and necessary in the usual course of running a summer resort.

Was respondent within the scope of his employment as relator's employe when shoveling the snow off the ice for Head's icehouse and when assisting Saxton in cutting it at the time of the accident? Relator had always paid for the work done in filling Head's icehouse. He and not Head had directed the men to do it. Of course, the men assumed, as respondent did, that Head would reimburse relator. In addition to the foregoing, this appears: Robert, relator's son, over 25 years of age, was employed as an assistant in running the resort. He was left in charge thereof when his father went away. Robert directed respondent what to do as long as he remained, and gave respondent written instructions as to what further to attend to after his departure on December 14, 1938. However, in these written instructions there was nothing in respect to the ice cutting. But Robert handed respondent the key to Head's icehouse, on which was a tag designating the size of the blocks of ice desired. Respondent testified that when this was done Robert told him that Earl Ricker was to put up ice "and that I was to see that it was put up." That afterward respondent learned from Ricker, as above stated, that, owing to the employment of himself and team by the WPA, he might not be able to do it. This was followed by the meeting a week or so later at the schoolhouse entertainment, when Saxton, Ricker, and respondent discussed the proposition of putting up the ice, and Ricker stated his employment with the WPA was in the way of his attending to the ice. So far as relator's ice was concerned, relator admitted it was a two-man job. But usually the same two men who filled relator's icehouse filled Head's. Re-

spondent claims he always kept his own time and never saw nor talked with Head in regard thereto, and always settled with relator for all ice cutting, receiving his pay directly from him. From the evidence the triers of fact could find that respondent in good faith undertook putting up the ice for relator as he always had it done, when Ricker, who had been engaged to do it, became unwilling to do so. Respondent knew that relator had theretofore directed the icehouses of both Head and relator to be filled by the same men at about the same time. Had relator been there and ordered respondent to clear both icehouses, shovel the snow off the ice, and start in cutting at Head's cottage, there could be no controversy as to relator's liability to respondent under the compensation law. In view of Robert's oral directions to respondent, when Head's key to his icehouse was handed to him, to see that the ice was put up, we think the triers of fact, if convinced that Ricker was not intending to keep his engagement with relator in respect to the ice, could well find that respondent acted within the scope of his employment when he got Saxton to assist him. We think the following cases so indicate: State ex rel. Duluth B. & M. Co. v. District Court, 129 Minn. 176, 151 N. W. 912; State ex rel. Albert Lea Packing Co. Inc. v. Industrial Comm. 155 Minn. 267, 193 N. W. 450; O'Rourke v. Percy Vittum Co. 166 Minn. 251, 257, 207 N. W. 636, 638. In the O'Rourke case the court said:

"An employe who, as a voluntary accommodation to his employer or to another, performs services outside the scope of his employment, is not within the act while performing such services. [Citing authorities.]

"But an employer may enlarge or extend the scope of the employment; and an employe who, at the direction of his employer or of a superior to whose orders he is subject, performs services outside the duties of his usual employment, and performs them in consequence of the existence of the relation of employer and employe and as incidental to the employment, is within the protection of the act while performing such services." [Citing cases.]

Of course the commission could have found that relator acted merely as agent of Head in procuring men to fill his icehouse, in which case they would have been in Head's employ and not in relator's. But the commission did not so find. In our view, the evidence furnishes a basis for finding that the men relator sent to fill Head's icehouse each year were his employes, that he bid them do that work, fixed the price, and paid it directly to them. Cases where the commission found that the accidentally injured person was an independent contractor and not an employe (Lemkuhl v. Clark, 209. Minn. 276, 296 N. W. 28; Ledoux v. Joncas, 163 Minn. 498, 204 N. W. 635) do not give us much aid here. Nor do cases, cited by relator, where an employe, against positive orders not to enter upon forbidden places on the employer's premises, does so enter and suffers accidental injuries. (Rautio v. International Harvester Co. 180 Minn. 400, 231 N. W. 214; Anderson v. Russell Miller Milling Co. 196 Minn. 358, 267 N. W. 501.)

There are a number of assignments of error against the items in the compensation award, such as for permanent disability, hospital expenses, nursing, doctors' fees, and ambulance cost; but the brief fails to call attention to the impropriety of any item. And we find nothing in the record justifying this court in eliminating any item.

The refusal of the commission to compel respondent to elect upon what theory he would proceed is assigned as error. It is enough to say that this court is not authorized by the workmen's compensation act to prescribe rules of procedure for the commission.

Saxton's widow was called by respondent and, over relator's objection, was permitted to testify as to the conversation she overheard between her husband, Ricker, and respondent at the schoolhouse entertainment. This ruling is claimed to be violative of Mason St. 1927, § 9817. Mrs. Saxton had no interest in the event of respondent's award. A very full discussion of our decisions on this statute is found in Dougherty v. Garrick, 184 Minn. 436, 239 N. W. 153, 77 A. L. R. 1286. It is also contended that it was error to exclude, on cross-examination of Mrs. Saxton, her answer

to the questions whether or not she intended to assert a claim against relator. She was cross-examined very fully in respect to her present feelings toward relator, and we can see no prejudice because she was not permitted to state whether she intended in the future to make some claim against him.

The writ is discharged and the award affirmed. Respondent may tax $75 as attorney's fees in this court.