CARL SCHNEIDER v. SALVATION ARMY AND ANOTHER.[1]

May 19, 1944.

No. 33,747.

*Reynolds & McLeod,* for relators.
*John E. Mullen,* for respondent.

[1]Reported in 14 N. W. (2d) 467.

STREISSGUTH, JUSTICE.

Respondent was awarded compensation for injuries received while working in the "Men's Social Service Department" of the relator Salvation Army at St. Paul. The only question presented is whether at the time he sustained his injuries he was an employe of the relator. The industrial commission so found, and the case is here on *certiorari.*

The Salvation Army is a most worthy charitable organization. Its work is rooted in human needs. In general, its program is designed to offer aid and succor to destitute, homeless, and derelict members of society. To these it gratuitously offers food, shelter, clothing, and work in a religious background, all in the hope that the individual may thereby regain his self-respect and self-confidence and again become a self-sustaining member of society. However, the fact that it is a purely charitable enterprise does not of itself release it from the obligations of our workmen's compensation act, which, unlike the acts of some states, does not except charitable or religious institutions, as such, from its operation, nor exclude their employes from its benefits. Where the relationship of employer and employe actually exists between a charitable institution and an injured workman, the latter is entitled to the benefits of our act, otherwise not. The criterion in each case is whether the claimant at the time of his injury was in the employ of the institution.

The Salvation Army carries compensation insurance, and neither it nor its insurance carrier raises any question as to the regular employes on its payroll upon which insurance premiums are paid. It must also concede that, as between it and respondent, the fact that, in computing insurance premiums, the board, lodging, and cash furnished respondent was not included in its payroll is not relevant, much less decisive, on the issue of employment, for no act or omission of an employer can deprive an actual employe of his rights under the compensation act. The sole claim of relator and its insurer is that respondent was not, in fact, an employe, but rather a client or patient in its industrial home, who was given board, lodging, and small cash grants for work done by him—

not as wages, but solely as a charity—to sustain his self-respect pending an opportunity to find regular employment elsewhere.

Under our act, "The term 'employer' means every person who employs another to perform a service for hire and to whom the 'employer' directly pays wages." Minn. St. 1941, § 176.01, subd. 5 (Mason St. 1927, § 4326[d]). By § 176.01, subd. 8(2), (§ 4326[g][2]), "employe" is defined to mean "Every person in service of another under any contract of hire, expressed or implied, oral or written."

The terms "employer" and "employe," as so defined, are manifestly complementary, and, in general, may be said to apply to the conventional relationship of employer and employe. 71 C. J., Workmen's Compensation Acts, § 159. Under the statutory definitions, a contract of hire, either express or implied, is essential to the existence of the relationship; without such contract, no benefits can accrue to an injured workman under the act. So the question here narrows down to whether the industrial commission was justified in finding as a fact that a contract of hire existed between the parties at the time of respondent's injuries. That question can be solved only by examining the history of the relationship between the parties, their agreements, oral and written, the activities pursued by respondent, and the measure of control exercised over him by relator, keeping in mind that we are dealing with a statute which is highly remedial and humanitarian in purpose and which accordingly must be given "a broad, liberal construction in the interests of workmen." Tillquist v. State Dept. of Labor and Industry, 216 Minn. 202, 206, 12 N. W. (2d) 512, 515; Wass v. Bracker Const. Co. 185 Minn. 70, 240 N. W. 464; 6 Dunnell, Dig & Supp, § 10385. As said in State ex rel. Duluth Brg. & M. Co. v. District Court, 129 Minn. 176, 178, 151 N. W. 912, 913:

"* * * The statute is highly remedial in character. The courts ought therefore to guard against a narrow construction, and should not exclude a servant from the benefits thereof, unless constrained by unambiguous language or the clear intent as gathered from the entire act."

Respondent originally applied for admission to relator's headquarters in St. Paul in November 1928, representing himself to be without funds, unemployed, and homeless. His application was accepted, and, with the exception of a short interval in 1931 and another in 1936, he lived and worked at relator's "Men's Social Service Department" on Kellogg Boulevard from that time until April 17, 1942, the date of his injury, and thereafter until October 21, 1942.

The "Men's Social Service Department" is devoted principally to the salvaging and processing of wastepaper and secondhand clothing. It is entirely self-supporting, receiving no financial assistance from the Community Fund or other philanthropic sources. Except for distribution of some of the clothing to inmates, the waste materials are there processed and sold. A part of the proceeds is used to pay the cost of the building in which the project is housed, and the balance is used to pay operating expenses, including weekly cash grants to inmates, the size of the grants being determined by the net income.

Upon entering the home, respondent asked the officer in charge, "How is chances to work here for a while until I get on my feet?" He was told, "If you want to make your living here you can, your room"; and, further, that he would not be paid more than $1.95 a week, with board and room. He thereupon signed a card agreeing to abide by the rules and regulations of the home and was assigned to work in processing wastepaper, for which he was given a weekly cash grant of $1.95, in addition to board, lodging, and clothing. Having shown an aptitude for the work and a willingness to continue on indefinitely, he was assigned regular work consisting mainly of trucking bales of wastepaper and operating a freight elevator. At least from 1936, when he last sought readmission to the home, he had regular working hours, his schedule being from 7:30 a. m. to 6:00 p. m., six days a week, with one hour for lunch. While at the home he was at all times under the supervision of a foreman and subject to the rules and regulations of the home, including a rule which subjected him to immediate dismissal at any time for an

infraction of the rules. The rules in effect at the time of his first and second admissions to the home provided for a forfeiture of all claims to cash grants in the event of a dismissal, but no such forfeiture provision was included in the 1936 rules in effect at the time of his last admission. His weekly cash grant was gradually increased until it reached five dollars per week about 1938, where it remained until he was accidentally injured on April 17, 1942, while operating the freight elevator.

In Hanson v. St. James Hotel, etc. 191 Minn. 315, 317, 254 N. W. 4, 5, this court held that our compensation act did not cover inmates of a mission home who were taken in as a matter of charity, furnished with board and lodging and sometimes clothing and small sums of money in return for "occasional services in and about its buildings," offered for the purpose of maintaining the health of the applicants and building up their morale. The respondent in that case applied to the St. James Hotel, operated by the Union City Mission, for a night's lodging, and the following day he was asked if he was willing to work. He assented and was assigned to washing walls. He continued such work for about seven days and sustained injuries on the seventh day. We held that there was no contract of hiring and that no relationship of employer and employe existed. Our conclusion was supported by authority. See Burns v. Manchester & Salford Wesleyan Mission, 1 B. W. C. C. (N. S.) 305; Hartford Acc. & Ind. Co. v. Dept. of Ind. Relations, 139 Cal. App. 632, 34 P. (2d) 826; Dery v. Salvation Army Ind. Home, Ill. Ind. Bd. No. 1785, 11 N. C. C. A. 79, Note III, although, as we pointed out, there was also authority to the contrary, which we declined to follow.

We have no desire to depart from the rule of the Hanson case, which governs situations where indigent men applying for relief at charitable institutions are assigned temporary work mainly for the purpose of building up their moral stamina. But the situation here is somewhat different. The work which respondent did was of a permanent nature and was necessary to the carrying on of the activities of the Kellogg Boulevard project. He was under the con-

tinuous control and direction of relator, doing its regular work at regular hours, from week to week and month to month, for the benefit of the project which it was sponsoring, as well as for himself. Such work required the services of at least some trained, experienced, and permanent employes, who were chosen, where possible, from the list of inmates.

There are numerous facts and circumstances disclosed in the record, including recitals in the applications for admission to relator's home signed by respondent, which tend to support relator's contention that it never employed respondent within the meaning of our compensation act. That relator sought by its rules and regulations to avoid the creation of an employer-employe relationship at the time respondent was admitted to its home in 1928 and readmitted in 1931 and again in 1936 may be conceded. Yet that fact did not prevent the parties from subsequently establishing such relationship by implied agreement, as the statute permits. And it must be kept in mind that "the mere form put on the transaction by the parties should be disregarded and its real substance made controlling. An employe entitled to compensation cannot contract away that right." Wass v. Bracker Const. Co. 185 Minn. 70, 73, 240 N. W. 464, 466.

Under all the facts and circumstances surrounding their 14-year relationship, it was a question of fact for the commission to determine whether an employer-employe relationship did exist at the time of respondent's injuries. No hard and fast rule can be laid down by which the exact status of every inmate of charitable institutions can be determined. The issue is one of fact where the evidence and permissible inferences to be drawn therefrom are in conflict. And that is the situation here. Just when, during his long period of residence at relator's home, respondent's status changed from that of a charitable patient to that of an employe need not be determined. Suffice it to say that the industrial commission was justified in finding as a fact that on the day of his injury respondent "was in the employ of the Salvation Army as a

laborer * * * under a Minnesota contract of hire." See Matter
of Hall v. Salvation Army, 261 N. Y. 110, 184 N. E. 691.
Affirmed.