MAYME T. BORAK v. H. E. WESTERMAN LUMBER COMPANY
AND ANOTHER.[1]

May 15, 1953.

No. 35,994.

*John M. Fitzgerald,* for relator.
*Shepley, Severson & Bey,* for respondents.

FRANK T. GALLAGHER, JUSTICE.

Certiorari to review an order of the industrial commission deny-ing compensation for the death of John O. Borak. Petitioner is the widow of decedent.

John O. Borak resided at New Prague, Minnesota, where he had been employed as manager of H. E. Westerman Lumber Company

---

[1]Reported in 58 N. W. (2d) 567.

for about nine years. At approximately 11 a.m. on November 27, 1951, he was found dead in his garage. The cause of his death was listed as accidental and due to carbon monoxide poisoning.

Borak's duties as manager of the lumberyard included making out estimates, bidding on jobs, collecting accounts, keeping books, at times supplying workmen or carpenters and supervising construction of jobs, and making small deliveries of materials. While it does not appear that it was necessary for him to have a car as a condition precedent to becoming manager, it does appear that he was expected to have his own car in connection with his managerial duties, for which he was paid seven cents a mile when the car was used in the furtherance of company business. He did not receive mileage in driving between the lumberyard and his home, which was about four blocks. His hours of employment were generally from 7:30 in the morning until 5.30 in the afternoon, although at times he worked evenings and week ends at the office or at his home. He furnished his own liability insurance on his car but, at the request of the company, named it as coinsured in the policy since it appeared that to do so involved no extra premium cost. On the day of his death he was scheduled to meet with officers of respondent company at the New Prague yard to audit accounts and send out invoices.

The record shows that on the morning of his death Borak had prepared to leave his home for the lumberyard shortly before eight o'clock. His wife had gone to Minneapolis earlier that morning, and he assisted his two small children with breakfast and in getting them ready for school. His son, Thomas, aged nine, testified that the three of them left the house together at about ten minutes to eight; that the children were going to ride with their father, who went into the garage to start the car while the children remained outside; and that the father later told the children to walk to school as he could not get the car started. The boy said that his father made it a practice to take the car to work every morning except when it was stormy or he could not get it started and that he had ridden in the car when his father carried lumberyard materials in

it. He said that his father did not always take them to school but, when he did, he would let them out at a corner about two and one-half blocks from their home, en route to the lumberyard, and they would walk the rest of the way.

Mrs. William Timmons, a sister of deceased who lived next door to the Borak residence, testified that her brother came to her home about five minutes after eight that morning and inquired whether any of the men of the household were at home and that he said he "wanted to get a pull because the car wouldn't start." When informed that the men were not at home he left, and that was the last time he was seen alive.

About eleven o'clock that morning Frank Franek called at the Borak home on his regular route to collect garbage. He went to the garage, which was located on the west side of the house, to get the garbage pail. There were two doors in the garage, a large one on the north side and a small entrance door on the south side, both of which were closed. The day was somewhat windy and cloudy. Franek testified that when he got to the garage he opened the small door and walked in but could see nothing "because the wind closed the door right after me" and there were no lights on in the garage. He opened the door, put a stick behind it to keep it open, walked back into the garage, and found the body of Borak lying on the garage floor between the car and the garage wall on the left-hand side of the car—the steering wheel side. His body was facing south, with the left front door of the car open and extending partially over him. The witness said that the hood of the car was open; the motor was not running but was somewhat warm; the ignition key was on; and some pliers, a screw driver, and a flashlight were on the floor of the garage somewhat near decedent's body.

The referee found that on November 27, 1951, decedent was in the employ of respondent company under a Minnesota contract of hire at a weekly wage of $63.46 for a six-day week; that he suffered a fatal accidental injury on that date; and that such injury did not arise out of or in the course of his employment. The referee denied the claim petition. The industrial commission affirmed the referee,

stating in its opinion that decedent was employed as manager of respondent company at the time of his death; that at times while so employed he was required with his own car to make deliveries of material, inspect jobs, collect bills, and do other errands for his employer; and that he was paid a monthly salary as manager plus mileage for his automobile "when he went out on company business away from the City of New Prague" but was not paid mileage for the use of his car to and from his home to the office in New Prague.

The sole issue raised by petitioner is whether or not the accidental death of John Borak arose out of and in the course of his employment with respondent company.

It is the position of petitioner that under the employment contract of decedent he was required to use his car each day in connection with his duties as manager. She argues in effect that the commission should have found as a matter of law that decedent was required to use his car in connection with his managerial duties; that nowhere in the record is there any evidence to the effect that decedent merely took his car to work each day for his own convenience; and that therefore his death arose out of and in the course of his employment.

We are therefore primarily confronted with the question whether under the record here the commission should have found as a matter of law that decedent used or was expected to use his car almost daily in connection with his position as manager.

Petitioner, Mayme T. Borak, testified that decedent took his car to work with him every day; that he used his car in his business when called out into the country to estimate proposed buildings and deliver small items; that she went with him at times, especially on Sundays or in the evenings; and that he used the car in collecting money due and owing the New Prague yard and to pick up materials in other yards belonging to the company. She also said that when she returned from Minneapolis about 7:15 on the evening of her husband's death she looked at the automobile and observed a house plan and a 50-foot tape in the back seat of the car and found a glazed building block in the trunk and two folding yardsticks and

some pads and pencils in the glove compartment. All these items would indicate a use of the car in connection with decedent's employment. His small son, Thomas, said that his father made it a practice to take the car with him every morning and that he had been with his father when he had made trips to a farm or to other towns with lumberyard materials.

Fred Witt, who succeeded decedent as manager of the New Prague yard and who worked with him as a yardman from February 1948, testified that it was decedent's practice to bring his car to the office almost every day except when there was so much snow that he could not get it out of his garage. When asked, "And when he had the car at the yard did he use it almost every day in connection with the business?" he answered, "I would say yes." He explained that Borak used his car to deliver materials and that he (Witt) had also used the Borak car to deliver materials while working as a yardman for the company.

Henry Westerman, president and treasurer of respondent company, said that, while he made only occasional trips to the New Prague yard, he imagined that it was necessary for decedent to use his car in connection with the business.

Curtis Westerman, secretary of the company, said that part of the job of a manager was to leave the yard and go out to a job if necessary and that, if he did not have a company car or truck, the company expected him to use his own car.

In the face of all the above testimony, we find nothing convincing in the record to satisfy us that decedent was not expected to use his car in connection with his employer's business. It is therefore our opinion that the inference is inescapable that as a matter of law decedent did customarily have his car, or was expected to have it, at his place of business and that his employer knew this, or should have known it, since decedent was allowed mileage when the car was used for company business and named his employer as a coinsured in his automobile insurance policy.

While we have uniformly held that, where the commission as the trier of facts has a choice between conflicting evidence or where

it may draw diverse inferences from the evidence, its conclusions must stand, we have also held that, where the conclusions reached are manifestly and clearly contrary to the evidence, they cannot stand. Campbell v. Nelson, 175 Minn. 51, 220 N. W. 401; Manley v. Harvey Lbr. Co. 175 Minn. 489, 221 N. W. 913; Grina v. Stenerson Brothers Lbr. Co. 189 Minn. 149, 248 N. W. 732.

The commission, in determining facts from competent evidence, must accept as true the positive unimpeached testimony of credible witnesses unless the same is inherently improbable or rendered so by facts and circumstances disclosed at the hearing. Manley v. Harvey Lbr. Co. *supra*.

In our opinion, the testimony was sufficiently positive and un-impeached to justify a finding that decedent had to have his car in connection with his business. If so, it follows that he had to get it started. There appears to be sufficient evidence here to indicate that he was working on the car, or was attempting to get it started, when the fatal accident occurred. There is testimony that the hood was partly up, that the front door on the side of the car where the body was found was open, that the ignition key to the car was on, and that pliers, a screw driver, and a flashlight were lying on the floor of the garage near the prostrate body—all indications that he had been working on the car. In addition, we have the evidence of his sending the children on to school because he could not start the car and of the call at his sister's home for someone to give the car "a pull" because of its failure to start.

Both sides cite Manley v. Harvey Lbr. Co. and Grina v. Stenerson Brothers Lbr. Co. *supra*. There are similarities in each of those cases to the case at bar. Each case involved death by carbon monoxide gas poisoning in a garage located at the home of the deceased. In each case the referee and the commission found, as here, that the death was accidental but did not arise out of or in the course of employment, and in each case this court reversed upon appeal.

In the Manley case, however, decedent had prepared to, and had announced his intention of, going out into the country that day to collect bills for the lumber company. He went to the garage to get

his car for the purpose of going to the filling station for gas and oil, and he was found about two hours later lying on his back on the floor with his head on an inflated spare tire. The engine of the car was running, and there were four fully inflated tires on the wheels of the car. A pair of pliers was in his hand, and close by were tools commonly used in changing tires.

In the Grina case the lumber company had its principal office in Moorhead with eight branch or local yards in the state. Decedent, who lived in Moorhead, was secretary, treasurer, and general manager of the company, and his duties were to visit its various yards for purposes connected with the business. The evidence shows that on the morning of his death decedent was planning to visit the yard at Averill apparently for the purpose of assisting in taking inventory. He had made an engagement the evening before to pick up a friend in the morning at the local hotel and take him to Averill. He went to the garage, started the motor of his car, and was asphyxiated by carbon monoxide gas.

It is true that in each of those cases it appeared that at the time of the accidental death decedent was attempting to start or repair his car preparatory to making an avowed trip on behalf of his employer while here it appears that at best decedent was only trying to start his car for the purpose of taking it to the lumberyard, as had been his practice, to be used if and when needed when he got it there. However, that difference in itself is not sufficient to warrant denying compensation where there is a reasonable inference that decedent was trying to start his car in order to take it to his place of business to be ready for use if necessary. Neither can compensation be denied under the facts and circumstances here because on the particular day of decedent's death his work probably would have been confined to work in the office on invoices, et cetera, inasmuch as it had been his custom for years to have the car at the lumberyard for company use when required.

In McBride v. Preston Creamery Assn. 228 Minn. 93, 36 N. W. (2d) 404, this court held that, where an employee's work required the use of his truck on a regular milk route part of which consisted

of a private road, injuries sustained by him while attempting to sand an icy hill on the private road preparatory to the performance of his next day's employment arose out of and in the course of his employment and, hence, were compensable under the workmen's compensation act.

Respondent cites Lorenz v. Wm. Lorenz Trunk Works, 187 Minn. 444, 245 N. W. 615, as bearing specifically on the fact situation in the case before us. We do not consider the fact situation there to be similar to the case at bar. In that case relator lived about a mile and a half from Eureka, near Lake Minnetonka. Both railroad trains and streetcars were available for transportation between Eureka and Minneapolis where relator was employed by respondent trunk works, operated by his brother. On the morning of the accident relator started for his place of work in his Ford coupe. It was raining, and near Eureka the car skidded and ran against a tree, injuring relator. At times prior to the accident, while employed by the trunk company, relator had used his car to deliver trunks and traveling bags to customers in the city, but his principal work was in the office of his employer. If a package was to be delivered between the factory and his home, as happened on a few occasions, relator would take it along on his trip home. Although relator's statements were somewhat conflicting as to arrangements for payment for the use of the car while delivering, it appears that he had some allowance from his employer for gas and oil. This court said there that relator used his car mostly for his own convenience in going to and from his work and that while so engaged he was not on his employer's premises or where his duties as an employee required him to be and it was not during the hours of service. The court further said that, if the employee had been accidently injured while carrying a package of his employer for delivery or while returning from such delivery, it could then be said as a matter of law that the accident arose out of and in the course of his employment but that the mere fact that on the day of the accident he was to come early because there was much delivering to be done did

not compel a conclusion that the moment he left his home in the auto he was in the course of his employment.

There is no showing in the instant case that the almost daily trips which decedent made to the lumberyard with his car were for his own convenience. The distance from his home to the yard was only about four blocks whereas in the Lorenz case the distance was about 18 miles, with other means of transportation available. Rather, it appears in the case at bar that decedent took the car with him primarily to have it available if needed in connection with his employment. Neither can it be said that he took his car for the purpose of conveying his children to school since the record shows that on the days they rode with him they were let out of the car at a corner along the way to the lumberyard.

M. S. A. 176.01, subd. 11, provides that the workmen's compensation law is—

"Not to cover workmen except while engaged in, on, or about the premises where their services are being performed, or where their services require their presence as a part of such service, at the time of the injury, and during the hours of service as such workmen; * * *."

In view of our holding that the record convinces us that as a matter of law decedent used or was expected to use his car almost daily in connection with his employment, we must conclude under the facts and circumstances here that as a practical matter part of his services in connection with his employment was to take his car with him to the lumberyard in order to have it ready when needed rather than having to go back to his home and get it each time. It is our opinion also that such service required his presence in his garage to start his car at the time of the injury and that his accidental death arose out of and in the course of his employment. Whether he should have taken the precaution to have the large door or both doors of the garage open before attempting to start the car is not before us for determination. The record shows that the day was windy, that the wind closed the small door when Franek first

entered the garage, and that he had to hold it open with the aid of a stick or brace.

The order of the commission is reversed with directions to award compensation in accordance with the statute with an allowance to petitioner of $250 attorneys' fees.

Reversed.