## JOSEPH W. KOKTAVY v. CITY OF NEW PRAGUE AND ANOTHER.[1]

March 16, 1956.

No. 36,754.

[1]Reported in 75 N. W. (2d) 774.

C. L. Nelson, for relator.

Sexton, Tyrrell & Jardine and B. A. McLeod, for respondents.

DELL, CHIEF JUSTICE.

Certiorari to review a decision of the Industrial Commission denying workmen's compensation benefits to the relator, Joseph W. Koktavy.

The relator is 53. years of age and is regularly employed as a linotype operator for the Suel Printing Company, the publishers of a weekly newspaper at New Prague. He also has been a member of the New Prague volunteer fire department for over 26 years, receiving compensation for his duties as secretary of the organization and for attending the monthly meetings.

For a number of years the volunteer fire department has been called on to fire aerial bombs at civic functions, particularly at the start of parades and football games. For football games relator, the fire chief, Ray N. Mahowald, and usually two other members of the volunteer fire department would take a fire truck to the games and set off a bomb as part of the flag-raising ceremonies preceding the games. On most of these occasions relator was the one who would ignite the bombs, usually under the direction of the fire chief. To shoot the bombs they are placed in a steel casing or tube about 18 inches long, which is used as a mortar. When the fuse, which is left extending over the open end of the mortar, is ignited, there is a propelling charge in the bomb which lifts it into the air, and when it reaches a certain height the other charge, the bursting charge, explodes.

The American Legion Post at New Prague has purchased these bombs and other types of fireworks for several years for use in civic functions such as the annual Fourth of July celebration. On June 2, 1950, the date of the accident which resulted in injury to the relator, he was chairman of the American Legion fireworks committee and had been a member of that committee since the end of World War II. He was one of the men who purchased the bombs for the legion. Some were stored in a shed behind the newspaper offices and some were kept in the firemen's locker at the city hall.

On June 2, 1950, for the purpose of promoting the United States Savings Bond drive, a bond rally was scheduled for New Prague. In connection with the rally and to give it a proper setting, a replica of the Liberty Bell was brought to the city. The county chairman of the drive had previously contacted the mayor of New Prague with reference to making arrangements for the staging of the bond-rally program. About noon of the day of the rally, the mayor telephoned relator at his home and requested that he come to the bond rally and set off a bomb. Immediately after receiving the phone call from the mayor, relator telephoned the chief of the New Prague volunteer fire department and informed him of the mayor's request and sought "to clear through him" before doing so. The chief said, "Well, go ahead" and further told relator that he was busy and that relator could take care of it. Relator then drove his car to the shed located behind the Suel Printing Company and picked up two bombs from the stock belonging to the American Legion. He then proceeded in his car to the site of the Liberty Bell on Central Avenue and Main Street. When he arrived there, he conferred with the mayor and they decided on the location from which the bomb would be discharged. Upon receiving a signal from the mayor, relator ignited the bomb fuse. Apparently both the propelling and bursting charges exploded simultaneously in the mortar. The mortar was shattered and a piece of it struck relator's left leg seriously injuring it. As a result of this accident, amputation of the leg was required. No evidence was introduced by the respondent to refute these facts, and upon the oral argument in this court, counsel for respondent

stated that the credibility of the witnesses was not questioned. The real question before us is what legal rights and obligations do the facts establish.

The referee found that the accidental injury did not arise out of or in the course of relator's duties as a volunteer fireman for the city of New Prague and denied relator's petition for workmen's compensation benefits. On appeal to the commission the findings of fact and determination of the referee were in all things affirmed.

Relator contends that the finding of the commission, to the effect that an employer-employee relationship did not exist at the time of the accident, is without foundation and is contrary to the evidence.

The issue of whether an employer-employee relationship exists in a particular case frequently presents a difficult question and no general rule can be laid down to cover all situations. Each case must depend to a large extent upon its own facts.[2] It should not be overlooked, however, that we are dealing with an act which is highly remedial and humanitarian in purpose and which accordingly must be given a broad, liberal construction in the interests of the workman.[3]

It is well settled in this state that volunteer firemen come within and are entitled to the benefits of the Workmen's Compensation Act.[4] While the element of compensation is an important factor in determining whether an employer-employee relationship exists, the test most emphasized in determining whether such a relationship exists is the *right* of the employer to control the employee in the performance of his duties.[5]

---

[2]Graf v. Montgomery Ward & Co. Inc. 234 Minn. 485, 49 N. W. (2d) 797.

[3]Sobczyk v. City of Duluth, 245 Minn. 569, 73 N. W. (2d) 795.

[4]Stevens v. Village of Nashwauk, 161 Minn. 20, 200 N. W. 927; 34 Minn. L. Rev. 486; see, Annotation, 81 A. L. R. 478, 481; 2 Schneider, Workmen's Compensation (Perm. ed.) § 392(a).

[5]Bolin v. Scheurer, 210 Minn. 15, 297 N. W. 106; Lemkuhl v. Clark, 209 Minn. 276, 296 N. W. 28; Wicklund v. North Star Timber Co. 205 Minn. 595, 287 N. W. 7; Graf v. Montgomery Ward & Co. Inc. 234 Minn. 485, 49 N. W. (2d) 797; Hansen v. Adent, 238 Minn. 540, 57 N. W. (2d) 681; Castner v.

·The specific right of the volunteer fire chief to authorize relator to fire the bomb at the bond rally held on June 2, 1950, and to control him in doing so, is set out in art. V, § 1, of the bylaws of the New Prague volunteer fire department which reads in part as follows:

"It shall be the duty of the Chief * * * to carry out and enforce these By-Laws to the best of his ability, to command the company and *have entire control thereof while on duty,* on parade, at a fire *and on all other occasions.* All orders given by him on such occasions shall be implicitly obeyed." (Italics supplied.)

█ The respondents argue that, despite the broad language of said bylaw, the practice of setting off bombs is so far removed from the volunteer fire department's main duty of fighting fires as to be outside the scope of relator's employment as a volunteer fireman. With this contention we cannot agree. The extreme danger involved in the use of fireworks, including aerial bombs of the type used in this particular instance, has been recognized by the legislature and regulated by statute for several years.[6] Fireworks, if improperly used or supervised, present a definite fire hazard and may well furnish a reasonable explanation as to why the volunteer fire department was called on to fire these bombs at the various civic functions.[7] In any event, it is generally recognized that firemen, as such, are often called upon to render public service where life

Christgau, 222 Minn. 61, 24 N. W. (2d) 228; Schneider v. Salvation Army, 217 Minn. 448, 14 N. W. (2d) 467.

[6] See, M. S. A. 616.433 to 616.438.

[7] § 616.435. "Sections 616.433 to 616.438 shall not prohibit supervised public displays of fireworks by cities, villages, and boroughs, fair associations, amusement parks, and other organizations. Except when such display is given by a municipality or fair association within its own limits, no display shall be given unless a permit therefor has first been secured. * * * The application shall be promptly referred to the chief of the fire department who shall make an investigation to determine whether the operator of the display is competent and whether the display is of such a character and is to be so located, discharged, or fired that it will not be hazardous to property or endanger any person. * * *"

or property is being jeopardized or endangered by causes other than fire.[8]

■ Moreover, the record shows that relator, as a member of the volunteer fire department, had been called upon on numerous occasions prior to the date of the accident in question to fire aerial bombs at various civic functions. While generally the extent of an employer's business is determined by the nature of the business itself, an employer may enlarge or extend the scope of the employment, and, therefore, when an employee performs services in consequence of the existence of the employer-employee relationship and as incidental to such employment, he is within the protection of the Workmen's Compensation Act.[9] In the instant case the regular practice of the volunteer fire department in firing aerial bombs at civic functions in and of itself evidenced such a pattern or custom

[8]See, Grym v. City of Virginia, 193 Minn. 62, 257 N. W. 661 (held that fireman killed while attempting to rescue two men asphyxiated in a well just outside the city limits was entitled to benefits under the Workmen's Compensation Act); Chavoya v. Industrial Acc. Comm. 22 Cal. App. (2d) 652, 72 P. (2d) 236 (volunteer fireman injured while operating "floodlight" truck at public celebration; held that he was injured while in the course of his employment); Barclay-Westmoreland Trust Co. v. Latrobe Borough, 131 Pa. Super. 513, 200 A. 271 (held that volunteer fireman drowned while engaged in rescue work at scene of flood 3 miles outside borough limits was entitled to benefits under the state Workmen's Compensation Act); McAnney v. Galloway Township, 120 N. J. L. 311, 199 A. 369 (workmen's compensation benefits awarded where volunteer fireman was killed when truck overturned on return from pumping water from cellar of a citizen of the municipality; see, also, 120 N. J. L. 313, 199 A. 370, where the New Jersey court stated: "If the ordinance be given the proposed narrow interpretation, these fire companies could not, even at the direction of the administrative superior or the governing body itself, render the essential services that have always been regarded as incidental to their operation, e.g., inspection to eliminate fire hazards, first aid, safeguarding life in emergencies not associated with fire, and so on;").

[9]O'Rourke v. Percy Vittum Co. 166 Minn. 251, 207 N. W. 636; Nygaard v. Throndson Brothers, 173 Minn. 441, 217 N. W. 370; Hagelstad v. Usiak, 190 Minn. 513, 252 N. W. 430; Chisholm v. Davis, 207 Minn. 614, 292 N. W. 268; James v. Peterson, 211 Minn. 481, 1 N. W. (2d) 844; 15 Minn. L. Rev. 800.

as to bring that activity well within the scope of the relator's employment.

In this respect the case of Grym v. City of Virginia, 193 Minn. 62, 257 N. W. 661, is quite similar to the instant case. There a fireman was killed while attempting to rescue two men asphyxiated in a well just outside the city limits. It was argued that compensation benefits should be denied on the grounds that the rescue attempt was ultra vires the city and beyond the scope of the fireman's employment. This court, speaking through Mr. Justice Stone, stated (193 Minn. 64, 257 N. W. 662) :

"There is proof that it has long been the custom of the Virginia fire department to make fire runs beyond the city boundaries and not to limit its aid in other cases of casualty, such as those of drowning and asphyxiation, to the urban area. The test is not whether the operation was *ultra vires* the city but the much narrower one whether the accident arose 'out of and in the course of the employment.' 1 Mason Minn. St. 1927, § 4261. There is plenary evidence that the usual course of Grym's employment included rescues, and attempts thereat, in cases of drowning and asphyxiation, whenever the firemen and their equipment (they had gas masks) would be of aid."[10]

Thus, if the evidence shows that the relator in the instant case was acting in his official capacity as a volunteer fireman at the time of the accident rather than in some other capacity, he is entitled to receive benefits under the Workmen's Compensation Act.

■ In resolving this question we are reviewing a decision of an administrative board and our function is to determine only whether the evidence is such that the board might reasonably make the order

[10]See, also, McAnney v. Galloway Township, 120 N. J. L. 311, 199 A. 369, where a fire chief was killed when a "pumper" overturned while returning from a call to pump water out of a cellar. The court there held that it was proper to admit evidence that this particular service was rendered in the municipality in accordance with a long-established custom.

or determination which it did.[11] The findings of the Industrial Commission are entitled to great weight and must not be disturbed unless they are manifestly contrary to the evidence.[12] Thus, if after an impartial consideration of the evidence and of the inferences which may fairly and reasonably be drawn therefrom reasonable minds might reach different conclusions upon the question, the findings must stand.[13] However, in the instant case we conclude that the determination made by the Industrial Commission, to the effect that the accidental injury suffered by the relator did not arise out of his employment as a volunteer fireman, is manifestly contrary to the evidence presented.

■ There is no dispute in the evidence before us and we have consistently held in such instances that the Industrial Commission must assume as true the positive, unimpeached testimony of credible witnesses unless the same is inherently improbable or rendered so by facts and circumstances disclosed at the hearing.[14] The record is replete with evidence and reasonable inferences to the effect that the relator was acting in his capacity as a volunteer fireman when he fired the bomb that caused his injury. On the other hand, there is nothing in the record to indicate that the relator was acting solely as a public-spirited citizen in responding to the request of

[11]Hamlin v. The Coolerator Co. 227 Minn. 437, 35 N. W. (2d) 616; Chellson v. State Div. of Employment & Security, 214 Minn. 332, 8 N. W. (2d) 42; Rinne v. W. C. Griffis Co. 234 Minn. 146, 47 N. W. (2d) 872; Nelson v. Reid & Wackman, 228 Minn. 137, 36 N. W. (2d) 544; Graf v. Montgomery Ward & Co. Inc. 234 Minn. 485, 49 N. W. (2d) 797.

[12]Baburic v. Butler Brothers, 233 Minn. 304, 46 N. W. (2d) 661; Baker v. MacGillis Gibbs Co. 222 Minn. 460, 25 N. W. (2d) 219; Erickson v. Globe Wrecking Co. 203 Minn. 261, 280 N. W. 866; Henz v. Armour & Co. 202 Minn. 213, 277 N. W. 923; Rinne v. W. C. Griffis Co. 234 Minn. 146, 47 N. W. (2d) 872; Graf v. Montgomery Ward & Co. Inc. 234 Minn. 485, 49 N. W. (2d) 797.

[13]Ibid.

[14]Campbell v. Nelson, 175 Minn. 51, 220 N. W. 401; Manley v. Harvey Lbr. Co. 175 Minn. 489, 221 N. W. 913; Lampi v. James H. Brown Co. 165 Minn. 169, 205 N. W. 953; Haller v. Northern Pump Co. 214 Minn. 404, 8 N. W. (2d) 464; Borak v. H. E. Westerman Lbr. Co. 239 Minn. 327, 58 N. W. (2d) 567; 23 Minn. L. Rev. 75, 79.

the mayor. In answer to respondents' claim that relator might have been acting as chairman of the American Legion fireworks committee, it should again be noted that he called no one other than the chief of the volunteer fire department. The very fact that relator called the fire chief in this instance immediately after receiving the call from the mayor indicates that, if the chief had refused to give his permission or approval, the relator would not have undertaken the firing of the bomb at the bond rally.

A reading of this record in its entirety can lead to but one reasonable conclusion, namely, that the relator was acting within the scope of his employment as a volunteer fireman for the city of New Prague at the time he fired the bomb that ultimately resulted in the amputation of his leg.

■ Finally respondents contend that at the time of the accident the employment was casual and not in the usual course of the employer's business and that, therefore, under the provisions of M. S. A. 176.041,[15] relator was not within the coverage of the Workmen's Compensation Act.[16] In view of our determination that this accident arose out of and in the course of the relator's employment as a volunteer fireman as well as the fact that relator had been a regular member of the fire department for over 26 years,[17] there is no merit in this contention raised by the respondents.

[15]§ 176.041. "This chapter does not apply to * * *, or [to] persons whose employment at the time of the injury is casual, *and* not in the usual course of the trade, business, profession, or occupation of his employer." (Italics supplied.)

[16]See O'Rourke v. Percy Vittum Co. 166 Minn. 251, 207 N. W. 636, and Amundsen v. Poppe, 227 Minn. 124, 34 N. W. (2d) 337, where we stated that to constitute casual employment it must be shown that the employment was both casual and not in the usual course of the trade, business, or occupation of the employer.

[17]See Amundsen v. Poppe, 227 Minn. 124, 129, 34 N. W. (2d) 337, 340, where we defined casual employment as follows: "Where the employment cannot be characterized as permanent or periodically regular, but occurs by chance, or with the intention and understanding on the part of both employer and employe that it shall not be continuous, it is casual."

The decision of the Industrial Commission is reversed with directions to award compensation in accordance with the Workmen's Compensation Act. The relator is allowed $300 attorney's fees in this court.

Reversed.

