JOYCE L. CAREY, WIDOW OF MICHAEL H. CAREY, DECEASED EMPLOYEE, v. LAWRENCE STADTHER, ADMINISTRATOR OF THE ESTATE OF EDWARD STADTHER, AND OTHERS.

219 N. W. 2d 76.

May 10, 1974—No. 44335.

*Shadduck & Katzman* and *Nobel Shadduck,* for relator.

*Gustafson & Waechter* and *Wallace F. Gustafson,* for respondent Stadther.

*Hansen, Dordell, Bradt & Koll* and *Wayne P. Dordell,* for respondents Bast and Great Central Insurance Co.

*William M. Robb* and *Curtis C. Gilmore,* for respondents Moorman Manufacturing Co. and Liberty Mutual Insurance Co.

Heard before Sheran, C. J., and Peterson, Kelly, and Yetka, JJ., and considered and decided by the court.

Yetka, Justice.

Writ of certiorari to review a decision of the Workmen's Compensation Commission denying dependency compensation benefits to Joyce L. Carey and her minor child, dependents of Michael H. Carey, deceased employee. We reverse.

On May 20, 1970, relator's husband, Michael H. Carey, died of asphyxiation while attempting to rescue one Edward Stadther from a well. At the time of his death, Carey was employed as a feed salesman for Moorman Manufacturing Company.

On the afternoon of May 20, 1970, Carey stopped at Dale Bast's Conoco Service Station located approximately 1 mile south of Paynesville, Minnesota, on Highway No. 55. Adjacent to the service station was Nelson's Restaurant. Carey lived near Highway 55 some 5 miles south of Paynesville and serviced a sales territory for his employer which consisted of three townships northwest of Paynesville. While the coffee shop was not located within his sales territory, it was an often-frequented coffee stop for farmers in the Paynesville area, including many who farmed in Carey's sales territory and were customers of Carey. It was Carey's habit to stop frequently at the restaurant to visit with area farmers over coffee. He had stopped there on the morning of his death.

The record is replete with evidence that Carey's sales technique and, hence, his livelihood were dependent upon the personal service and face-to-face relationships which he carefully cultivated among farmers—customers and potential customers—within the community in which he lived. Carey, in fact, lived a sales technique exhorted by Moorman, which sought through the personal services of Moorman sales representatives to distinguish its product from others in the highly competitive business of selling livestock feed.

Carey was successful. He had one of his company's better cash sales records and was often looked on by his customers as a "helping hand." Many of the acts which earned him this success and reputation are enumerated in the record. They include help-

ing bring in cattle, dehorning calves, helping with baling and fencing, and weighing cattle. The record also shows that Moorman encouraged and expected of Carey the type of community service practiced by him and that Moorman looked upon such activities as an essential sales technique.

It was against this background that Carey responded to a call for help from an associate of Stadther, James Toupal. Stadther and Toupal were drilling a cesspool well approximately 100 feet from the coffee shop on the afternoon of May 20, 1970. When Carey reached the scene, Stadther, who had been employed by Dale Bast of Bast Oil Company to dig the hole for the cesspool, was lying at the bottom of the hole about 30 feet below the surface.

When Carey reached the hole he told Toupal, "I can still hear him breathing. Let me down there." Carey descended into the hole via a cable and a hoist operated by Toupal. Carey was in the hole about 15 seconds when he yelled, "I smell something, pull me up." Seconds later, while being hoisted from the hole, Carey collapsed. Both Carey and Stadther were later found to have died from asphyxiation.

Relator claims that she is entitled to dependency benefits under the Workmen's Compensation Act, Minn. St. 1969, § 176.111, because Carey's death arose "out of and in the course of employment" with Moorman. Minn. St. 176.021, subd. 1. In the alternative, relator asserts that Stadther and Bast became coemployers of Carey when he responded to Toupal's calls for help. This assertion is based on the alleged authority of Toupal to hire in an emergency and on Bast's control over the work on the site.

The compensation judge found that Carey was not on the date of his death in the employ of either Bast or Stadther, but that Carey was in the employ of Moorman. The compensation judge further found:

"That the personal injury and death of Michael H. Carey * * * arose out of and in the course of employment for Moor-

man Manufacturing Company and was due to the nature, circumstances and incidents of said employment relationship."

An appeal was taken to the Workmen's Compensation Commission and the finding of the compensation judge as to Moorman was reversed in a split decision. The commission majority based its decision upon this court's decision in Weidenbach v. Miller, 237 Minn. 278, 55 N. W. 2d 289 (1952). In that case, benefits were denied the widow of a delivery truck driver who died in an attempt to rescue a drowning man. In the opinion of the commission majority, Weidenbach controls here.

The issues in this case are:

1.   Did the commission err in holding that one who is killed while responding to calls for help in an emergency is not acting within the scope of his employment as a salesman?

2.   Did the commission err in holding that one who responds to calls for help in an emergency does not become the employee of the person imperiled?

3.   Did the commission err in holding that Stadther's relationship to Bast was that of an independent contractor, and that Carey therefore did not become an employee of Bast?

With exceptions not relevant here, Minn. St. 176.021 provides that employers are liable to pay compensation in every case of personal injury or death of an employee "arising out of and in the course of employment without regard to the question of negligence * * *." The underlying policy of the Workmen's Compensation Act is to spread the cost of accidental injury by making such injuries a cost of doing business or a cost of production. Hubbard v. Midland Constructors, Inc. 269 Minn. 425, 131 N. W. 2d 209 (1964). The act is remedial legislation which is to be given broad and liberal construction. Sandmeyer v. City of Bemidji, 281 Minn. 217, 161 N. W. 2d 318 (1968); Hill v. Terrazzo Machine & Supply Co. 279 Minn. 428, 157 N. W. 2d 374 (1968); Kolbeck v. Myhra, 255 Minn. 341, 96 N. W. 2d 633 (1959).

In Weidenbach v. Miller, 237 Minn. 278, 55 N. W. 2d 289 (1952), this court held, with three justices dissenting, that the death of a truckdriver while attempting to rescue a drowning man did not arise out of and in the course of the truckdriver's employment.[1]

In defining the statutory phrase "arising out of and in the course of employment," the Weidenbach court quoted with approval the following statement from Caswell's Case, 305 Mass. 500, 502, 26 N. E. 2d 328, 330 (1940):

"* * * It [the injury] need not arise out of the nature of the employment. An injury arises out of the employment if it arises out of the nature, conditions, obligations or incidents of the employment; in other words, out of the employment looked at in any of its aspects." 237 Minn. 281, 55 N. W. 2d 291.

That language has since been used with approval in Snyder v. General Paper Corp. 277 Minn. 376, 379, 152 N. W. 2d 743, 745 (1967).

In Sandmeyer v. City of Bemidji, *supra,* and in Koktavy v. City of New Prague, 246 Minn. 550, 75 N. W. 2d 774 (1956), this court seemed to extend the definition by holding that "an act encouraged, but not required by the employer" was within the scope of employment. 281 Minn. 221, 161 N. W. 2d 320. In Sandmeyer, an off-duty police officer with the city of Bemidji was fatally wounded while engaged in target practice with his service revolver. This court affirmed the commission's finding that Sandmeyer's death arose out of the course of his employment and also affirmed the award of benefits to his widow and minor children. In Koktavy, this court reversed the commission and ordered it to award benefits to a member of a volunteer fire department who was injured while assisting in the staging of a fireworks display for a savings bond drive rally.

---

[1] Mr. Justice Thomas Gallagher, joined by Mr. Chief Justice Loring and Mr. Justice Frank Gallagher, dissented on the ground that the decedent's employer had directed him in the rescue operations and had thus extended the scope of decedent's employment.

Was Carey's act in going to the aid of a man lying at the bottom of a well the type of conduct encouraged by his employer? The record unequivocally shows that the company actively encouraged its salesmen to represent the company by being helpful. The testimony of John Finnegan, Carey's immediate supervisor, furnishes an example:

"THE JUDGE: * * * [W]hat do you do to develop good will?

"THE WITNESS: Oh, you'd help somebody if they needed help in a situation. Flat tire maybe.

"THE JUDGE: In other words, you were helpful where you could be.

"THE WITNESS: Where you could be, right.

* * * * *

"BY MR. SHADDUCK [petitioner's attorney]:

"Q. Do you believe that this sales technique you learned from Dale Carnegie resulted in increase in business when carried out by your salesmen?

"A. Yes.

"Q. And do you urge your salesmen to take this course?

"A. Yes.

"Q. And did you tell them what went on in the course?

"A. Yes.

"Q. And, now, did you see or did you accompany Mike Carey at times when he sold?

"A. Yes.

"Q. Did you see that he adopted some of the principles that you have set out by Carnegie about doing favors for people and things like that? Did you see him follow that course of conduct?

"A. Yes.

"Q. And can you give us an illustration of that?

"A. None right—no one to my memory right at this time.

"Q. By being friendly and doing favors, that's one of the sales techniques—

"A. Definitely."

Moorman argues in its brief that the sales technique which it inculcated in its employees did not either intentionally or inadvertently embark its salesmen "upon a course of indiscriminate knight-errantry." Moorman contends that nothing in the sales technique taught its salesmen encourages the risking of their lives to sell products or promote the image of the company. However, the argument that the company did not exhort anyone to risk his life artfully props up and then beats down a strawman. There is not one scintilla of evidence in the record that Carey deliberately risked his life in going to the aid of Stadther. In this respect, the instant case is distinguishable from Weidenbach as well as all other cases cited by the parties to this action.

All of the evidence is contrary to the proposition that Carey deliberately risked his life. The physician called to the scene of the accident testified that sewer gas is toxic, and that Carey and Stadther both died of asphyxiation. However, he could not testify with certainty as to the actual cause of asphyxiation. He did venture "that sewer gas would be the logical cause of the asphyxiation." The testimony in the record seems to indicate that the sewer gas absorbed all of the available oxygen, creating an oxygen vacuum which caused the death of the two men. What is apparent is that Carey's rescue attempt was not similar to the classic rescues where one, in disregard of his own life, dashes into the path of a locomotive to save an infant on the tracks, enters a burning building to snatch a child from a crib, or, as in Weidenbach, ventures onto thin ice to rescue a drowning man. In contrast to those situations, Carey's death was a freak accident.

Where even the examining physician was unsure of the exact hazard that caused Carey's death, it is inconceivable that Carey could have appreciated the danger involved in going to Stadther's aid. Indeed he could have thought that Stadther had a heart attack, which would be a logical assumption. There was no cave-in or other readily discernible hazard. Even Moorman points out in its brief that the circumstances of Carey's death were an "un-

usual—not to say bizarre—set of circumstances not ordinarily expectable." What is plausible from the record is not a dashing, "devil-may-care" rescue attempt, but an attempt to help a man who collapsed at the bottom of a well from what was apparently a heart attack.

The latter type of action appears absolutely consistent with the type of conduct that Moorman encouraged in its sales representatives. Had Carey instead been injured or killed while helping someone change a flat tire, or installing a 400-pound drill press (which the record indicates that he did on the day he died), there seems little doubt that those activities would be classed as "encouraged, but not required by the employer," and, hence, within the scope of employment. It is apparent that the instant case is governed, not by Weidenbach, but by Sandmeyer v. City of Bemidji, *supra,* and Koktavy v. City of New Prague, *supra.*

As previously pointed out, the fact situation here is easily distinguishable from Weidenbach, and the general question of whether a dangerous rescue attempt may arise out of and in the course of a salesman's employment need not be reached. Nevertheless, no small number of arguments can be advanced in support of holding a rescue attempt within the scope of employment. The purpose of the Workmen's Compensation Act itself—to spread the cost of accidents—should for policy reasons require that the act extend to rescue situations. If compensation is denied here, the cost of the rescue attempt must be borne entirely by the wife and child of Carey, but the cost of the accident is no less because it occurs while an employee is attempting to help someone. This court has frequently in its opinions alluded to the proposition that the Workmen's Compensation Act should be liberally construed to effectuate its remedial purpose. The public policy embodied in the act is best served by construing the act to apply to cases such as that at bar. Moreover, it apears that our legislature, in 1971, by enacting Minn. St. 604.05, the so-called Good Samaritan Law, intended to encourage persons going

to the aid of others in emergency situations. Public policy should demand that one respond to cries for help even if on the job.

The record appears to support the claim of Bast that Stadther was an independent contractor and thus not an employee of Bast. Therefore, the facts do not justify a finding that Carey was an employee of Bast. Furthermore, there is insufficient evidence to indicate whether Toupal had the authority to, or did, engage Carey as an employee of Stadther. We hold that Carey was employed only by Moorman at the time of his death.

The decision of the Workmen's Compensation Commission is reversed with directions to award dependency benefits in accordance with the Workmen's Compensation Act.

Relator is allowed attorneys' fees of $400.

SHERAN, CHIEF JUSTICE (dissenting).

The determination of the commission should be affirmed where it is consistent with precedent and has reasonable support in the evidence. In my judgment, Weidenbach v. Miller, 237 Minn. 278, 55 N. W. 2d 289 (1952), is controlling under the facts of this case.

PETERSON, JUSTICE (dissenting).

Relator's husband, Michael H. Carey, died in a brave act of selfless service to a fellow man. The majority opinion—contrary to the *unanimous* finding and determination of the Workmen's Compensation Commission—would treat that act merely as a self-serving act by a salesman for his employer, Moorman Manufacturing Company.[1] Although the motivation for this unprecedented decision is generous, I am compelled to dissent. I would affirm the commission with respect to all issues raised in these proceedings.

The majority opinion adopts the thesis advanced by relator but rejected by the commission: that Carey would be a more suc-

---

[1] I concur in the court's opinion that decedent was an employee of Moorman Manufacturing Company and of no other party to the proceedings.

cessful salesman of his employer's farm feeds if he used the sales "technique" of being friendly and being of service to customers and potential customers. To be sure, the employer had encouraged decedent to take the Dale Carnegie course on "How to Win Friends and Influence People" and had given him an Earl Nightingale motivational recording, "Success . . . & You." One side of the Nightingale record was a general inspirational message that successful people cultivated good attitudes, set for themselves worthy goals, and persisted in the pursuit of those goals. The other side of the record was simply a suggested "track" for making effective sales presentations of Moorman products. Neither Carnegie nor Nightingale would suggest that these principles or techniques were of their invention.

The application of these principles in the context in which they were given and applied is not unique: to increase the employee's commission earnings and the employer's profits by achieving more sales to farmers in the market for feed. Six of decedent's customers testified to various helpful acts he had performed for them in the course of making sales: helping put up a drill press; helping fix a corn picker; helping dehorn calves; starting a snowmobile; giving a set of punch tools to a customer; helping roll up some fence wire; helping unload hay; helping stack bales of hay; helping fix a baler; helping plan a hog set-up; helping determine a disease in some hogs; helping to pen some sows; delivering small loads of feed. The primary purpose was to ingratiate and to be rewarded with a sale. As one farmer-customer testified:

"* * * He came out and tried to help you out in trying to sell the feed, you know, he was out to sell the feed, but still at the same time tried to help you out."

Or, as another farmer-customer testified:

"Well, he wasn't a high-pressured salesman. He'd come in and talk with you first or help with whatever I was doing and at that time he started selling feed."

This technique was, without doubt, recommended by his district sales manager "[a]s long as it didn't occupy too much of [his] time."

It is clear, however, that the employer did not give its salesmen a roving commission, as part of their employment, to render "favors" to persons who were not in the market for feeds or, indeed, to persons outside their prescribed territory. The district manager testified that decedent was not authorized to make commission sales to persons outside his territory except upon authorization of both the sales manager and the salesman in such other territory. To be sure, decedent had stopped for coffee at a highway coffee shop just outside his territory and presumably frequented by farmers residing within his territory. The important fact, however, is that the man to whom he rendered rescue service was a total stranger and a nonfarmer who was neither a regular customer nor a sales prospect.

Decision, in any event, is controlled by our decision in Weidenbach v. Miller, 237 Minn. 278, 55 N. W. 2d 289 (1952). The employee there was a pop and beer driver-salesman who, while driving along the shore of Lake Minnetonka in the company of his employer, went to the rescue of a stranger who had broken through the ice of the lake. The employee drowned in an unsuccessful rescue attempt. We affirmed the Industrial Commission's finding and determination that the employee's death did not occur in the scope of his employment. A minority of the Weidenbach court would have reversed the commission's decision only because the employer had personally directed and participated in the rescue effort, expressly extending the normal scope of the employment. Otherwise, as noted by Mr. Justice Knutson, writing for the majority, if the employee had "been riding alone when he went to the assistance of the third person, we would have no difficulty in holding that his death did not arise 'out of' his employment" (237 Minn. 291, 55 N. W. 2d 296).

The commission in this case, adverting to that distinction in the Weidenbach case, said:

"* * * The decedent in the instant case had no instructions from the employer to render assistance to persons in peril. The evidence as a whole regarding decedent's sales training shows that it was sales oriented and we do not believe it can be reasonably inferred that by virtue of decedent's sales training that he was to render assistance in all situations to the general public. In our opinion, the circumstances in the case do not show that decedent's bold and courageous act of going down into the hole was incidental to his employment or that it could have been reasonably contemplated he would have so exposed himself to the risk of so doing as an incident to his employment. We hold that his death did not arise out of and in the course of his employment with Moorman."

OTIS, JUSTICE (dissenting).
I join in the dissent of Mr. Justice Peterson.
McRAE, JUSTICE (dissenting).
I join in the dissent of Mr. Justice Peterson.