ELIZABETH HUBER v. HENNEPIN COUNTY
WELFARE BOARD AND ANOTHER.

83 N. W. (2d) 511.

May 24, 1957—No. 36,998.

*George M. Scott,* County Attorney, and *John K. Harvey,* Assistant County Attorney, for relator Hennepin County Welfare Board.

*Reynolds & McLeod* and *C. C. Gilmore,* for relator insurer.
*S. H. Bellman* and *M. I. Kirshbaum,* for respondent.

KNUTSON, JUSTICE.

Certiorari to review a decision of the Industrial Commission awarding compensation to respondent.

Mrs. Clara Birmingham has been a recipient of old-age assistance since 1936 or 1938. Respondent, Elizabeth Huber, had been a friend of Mrs. Birmingham for some 30 years. They worked together in lodges in which they were mutually interested, and Mrs. Huber had often visited at Mrs. Birmingham's home. In 1952, Mrs. Birmingham became ill, and Mrs. Huber began calling on her two or three times a week to assist her in various ways. For such services she was paid small amounts by Mrs. Birmingham from time to time. In July or August 1952, a case worker for the Hennepin County Welfare Board, in making a routine call at the home of Mrs. Birmingham in connection with her old-age assistance, found Mrs. Huber there and then, for the first time, was informed that Mrs. Huber had been assisting Mrs. Birmingham and that Mrs. Birmingham had been paying her out of her own money. The two women were then informed that, if a doctor's recommendation could be obtained, the welfare board could make an allowance to Mrs. Birmingham for practical nursing care and could also reimburse the recipient of old-age assistance for the money she had personally paid out for such care up to that time. Thereafter, a doctor's recommendation was procured, and the welfare board increased the old-age assistance grant of Mrs. Birmingham from $60 per month to $142.50 per month, of which sum $82.50 was a grant for nursing care. At the request of Mrs. Huber, this amount was paid directly to her by the welfare board, but the grant was charged to the old-age assistance account of Mrs. Birmingham and the checks issued bore her account number. Respondent was paid this amount for the months of September, October, and November 1952. During the early part of December 1952, Mrs. Birmingham went to California, returning during the late part of December. During her absence and from December 4, 1952, until December 1, 1953, nothing was paid for nursing care.

Late in 1953, Mrs. Huber was paid on a per diem basis at the rate of two dollars per day plus transportation. She was so paid for the intervals from December 1 to 5; December 7 to 11; December 14 to 19; December 21 to 24; December 28 to 31; and from January 4 to 15; January 18 to 22; and on January 25, all in 1954.

Periodic calls were made by a case worker on recipients of old-age assistance, and in this case, among other things, they checked to see if Mrs. Huber was performing the services for which she was paid. The executive secretary of the welfare board testified that, if they had found that respondent was not doing what the doctors required of her, the welfare board would have ceased making the payments they had allotted to Mrs. Birmingham for such services. In that event, Mrs. Birmingham either could procure someone else to serve her or she could make whatever arrangements she wanted to make for respondent's services and pay for them herself. The testimony of the executive secretary of the welfare board in that respect was as follows:

"Q. And assuming the situation where the practical nurse was not taking care of the recipient properly, would the worked than [sic] require her to be discharged?

"A. No, that would be up to the recipient. We couldn't require anybody to discharge.

"Q. Would you continue to make payment to an inefficient practical nurse?

"A. I think that we would, upon the worker calling in the home. The main problem, the main criterion that we go by is the medical condition of the patient, and in all these cases—I mean, conferring is done with the physician on the case.

"Q. Supposing the physician, upon requiring them certain medication to be given to the recipient, finds that the medications are not given, the proper food is not made for the patient, and he informs the social worker in the case that the practical nurse should be discharged, would you continue to make payments under those circumstances?

"A. No. If the doctor advises that these injections and so forth as you mentioned were not being given properly, we would advise the recipient that since the doctor indicated that the service was no longer being received, we would no longer continue to pay. I mean, as far as if he or she wanted to keep this person with them, they could make any arrangement they wanted to.

"Q. But you would cease making payments,—isn't that true?

"A. That is right. Or if the doctor indicated that the care was no longer necessary."

A former case worker of the welfare board testified with respect to the type of supervision given as follows:

"A. Well, nursing care was according to what a doctor ordered, and we were to see that that care was carried out.

"Q. You supervised and saw to it that the care that the doctor ordered was carried out?

"A. Yes.

"Q. And as such, when you came into the home, you determined what care was given?

"A. Yes, sir.

"Q. And you checked that against the doctor's orders?

"A. Yes, sir.

\* \* \* \* \*

"Q. Supposing Mrs. Birmingham refused to change and the doctor said that the care was not sufficient and that it is detrimental, what would you do in that case?

"A. Well, if the care wasn't being given that was supposed to be given,—

"Q. You would terminate?

"A. You couldn't pay for it."

On January 25, 1954, while Mrs. Huber was caring for Mrs. Birmingham, she fell and received certain injuries for which she filed a claim petition seeking benefits under the Workmen's Compensation Act against the Hennepin County Welfare Board. The Industrial Commission, by a divided decision, awarded her compensation. The

only question before us is whether, at the time Mrs. Huber sustained such injuries, she was an employee of the Hennepin County Welfare Board within the meaning of our Workmen's Compensation Act.

■ The origin and development of our state Department of Public Welfare, under which the county welfare board operates, are sufficiently set forth in State ex rel. Hennepin County Welfare Board v. Fitzsimmons, 239 Minn. 407, 58 N. W. (2d) 882. In Hennepin County, the board of county commissioners constitutes the county welfare board.[1] While the personnel of the two boards are the same, the powers, duties, and authority of the county welfare board are governed by the law pertaining to social welfare.[2] In order to conform our state law to the Federal Social Security Act,[3] the county welfare boards operate pursuant to rules and regulations, having the force of law, established by the commissioner of public welfare. M. S. A. 393.07, subd. 3, reads in part:

"* * * The duties of such county welfare board shall be performed in accordance with the standards, rules and regulations which may be promulgated by the commissioner of public welfare in order to comply with the requirements of the federal social security act and to obtain grants-in-aid available under that act."

Rules have been adopted by the commissioner (formerly director) of public welfare for the employment of personnel on a merit system. Such rules and regulations have the force and effect of law.[4] It follows that the hiring of personnel for county welfare boards under the merit system is just as mandatory under such rules as if it had been required by statute.

Much the same question as we have before us here arose in Aslakson v. State Dept. of Highways, 217 Minn. 524, 525, 15 N. W. (2d) 22, 23, in which case respondent was hired by the State Highway Department under what was called a "Rental Agreement For

[1]M. S. A. 393.01.
[2]M. S. A. 393.07.
[3]42 USCA, § 301, et seq.
[4]State ex rel. Hennepin County Welfare Board v. Fitzsimmons, 239 Minn. 407, 58 N. W. (2d) 882.

Truck And Operator." While we held there that the relationship of master and servant existed by virtue of L. 1941, c. 478, § 1(d), our language pertaining to the creation of the relationship of master and servant outside the civil service laws, in the absence of some other law permitting such hiring as an exception to the general law, is applicable here. We there said (217 Minn. 526, 15 N. W. [2d] 23):

"'* * * Respondent in effect admits that generally under the state civil service act any employment not made as therein provided is prohibited and that his employment was not authorized or attempted thereunder, but he contends that express authorization for the employment is found in c. 478, and that, since the employment was authorized, the relation of master and servant existed and the award of compensation was justified.

"The problem presented is one of statutory construction. At the time of the accidental injury, employes of the state highway department were covered by the workmen's compensation act. * * * The state civil service act prohibited the employment of any person except in the manner therein provided. * * * Therefore, unless authority for an employment can be found in c. 478 * * *, there was no legal employment.'"

We determined that c. 478 specifically covered the hiring there involved, and, applying the rule that where there is a conflict between a general provision and a special provision in the same or another law the special provision would govern over the general, there was legal authority for the hiring. However, the rationale of the decision is that, absent some other statutory provision permitting the hiring, there could have been no legal employment. That is the situation we have here. Respondent has not made any claim that there are other permissible legal methods whereby hiring can be done outside the merit system established by rules promulgated by the commissioner of public welfare. Nor have we been able to find any in our research. It must follow that there can be no legal employment by the county welfare board except as permitted under the established merit system.

■ There are other reasons why the evidence in this case falls short of establishing such relationship. The county welfare board, the same as the board of county commissioners, operates as a unit. No single member of the board, nor any employee of the board, can make a contract binding on the board. It is elementary that, absent ratification, a contract made by a single member of the board or an employee of the board is not binding upon the board.[5] There is a complete absence of any evidence showing any authorization granted by the board to an employee of the welfare board to hire other employees, and no ratification of such action by the board is shown, if it could be assumed that there was an attempt to make such contract. All employees of the board who testified denied that they had any authority to hire other employees.

■ Respondent contends that the welfare board prescribed the duties of respondent and had control over the performance thereof. The evidence establishes only that certain case workers employed by the board made periodic investigations to see, among other things, whether respondent followed the instructions of the attending physician. The only evidence indicating control is the testimony that, if respondent did not perform the duties required of her by the physician, the allotment to Mrs. Birmingham for such nursing services would be cut off. She could then make other arrangements with someone else and, if approved by the welfare board, the allotment would be made to her again, or the recipient could retain respondent on such terms as she saw fit and pay for such services out of her own funds. The evidence does not show such control as ordinarily would establish a relationship of master and servant.

■ Finally, respondent contends that payment by the welfare board directly to her is evidence of her employment by the welfare board. Here, again, the provisions of our statute are to the contrary. Prior to 1945, no allotment could be made as part of an old-age assistance grant for medical, dental, surgical, or hospital assistance

---

[5]Gardner v. Board of Co. Commrs. 21 Minn. 33; True v. Board of Co. Commrs. 83 Minn. 293, 86 N. W. 102; State ex rel. Erb v. Johnson, 98 Minn. 17, 107 N. W. 404.

or nursing care.[6] At that time, nursing care, as well as the other items enumerated above, was paid out of relief funds, not as a part of old-age assistance.[7] Section 256.15 was amended by increasing the maximum monthly allowance to an old-age recipient from $30 per month to $40 per month by L. 1943, c. 456, but the provision with respect to payment for nursing care remained the same as it was prior thereto. L. 1945, c. 302, first provided for an allotment for medical and nursing care above the maximum allowance of $40 per month for ordinary care. L. 1945, c. 302, § 1, subd. 2, reads as follows:

"The manner and amount of old age assistance payments shall be fixed with due regard to the conditions in each case in accordance with the rules and regulations of the state agency, but in no case shall it be an amount which, when added to the net income and resources available to the support and care of the applicant, exceeds a total of $40.00 a month, *except for medical, dental, surgical, hospital, nursing, or licensed rest home care, * * *.*" (Italics supplied.)

Thereafter, the old-age assistance grant could include an allotment for nursing care as part of a grant to be paid out of old-age assistance funds. However, prior to 1951, in conformity with the Federal Social Security Act, old-age assistance payments could be made only to the recipient of the grant. M. S. A. 1949, § 256.28, read:

"All payments of old age assistance must be issued to the recipient except in those instances in which a legal guardian has been appointed by the court having jurisdiction to make such appointments."

This provision was amended by L. 1951, c. 118, § 2, to read:

"Subdivision 1. All payments of old age assistance must be issued to the recipient except:

"(1) in those instances in which a legal guardian has been appointed by the court having jurisdiction to make such appointments;

---

[6]See, Minn. St. 1941, § 256.15.

[7]Minn. St. 1941, § 256.15, subd. 3, read:

"While a recipient is receiving old age assistance he shall not receive any other relief from the state or from any political subdivision thereof except for medical, dental, surgical, or hospital assistance or nursing care."

"(2) in those instances in which the county agency, subject to rules and regulations of the state agency, determines that payments for medical care shall be made directly to the vendor of such care.

"Subd. 2. 'Medical care' as used in this section shall mean, medical, dental, surgical, hospital, nursing or licensed nursing home care. Payments of grants under section 256.15 for all other purposes shall be made to the recipient."

Thereafter, the grants made for those purposes which came within the statutory definition of medical care, which included nursing care such as we have here, could be made directly to those who performed the services.

We assume that, if this case had arisen prior to the 1951 amendment, no one would contend that respondent was an employee of the county. The allotment for nursing care then would have been paid to the recipient as part of her old-age assistance grant, and respondent in turn would have had to look to Mrs. Birmingham for payment. The obvious purpose of the amendment was to make certain that those who rendered the type of service mentioned in the statute actually would receive the payment allotted to the recipient for that purpose. Payment directly to the person rendering such service is no evidence establishing a relationship of master and servant between the board and the payee. It is simply a method of providing that the money allotted for a specific purpose goes to pay for the service for which it is allotted. The whole allotment is still charged to the account of the recipient and carries with it all the obligations and liabilities incident to any other part of the grant.

The evidence in this case does not establish that respondent was an employee of the Hennepin County Welfare Board.

Reversed.

Thomas Gallagher, Justice (dissenting).

I am of the opinion that the decision of the Industrial Commission should be affirmed. The evidence appears to amply support the commission's finding that respondent was in the employ of relator at the time of her accident. Miss Marjorie J. Carpenter, who represented relator, testified that respondent had requested that she be paid by

relator and had been advised that she would receive her checks from relator. Mr. Benjamin C. Zuckman, another employee of relator, testified that on one occasion in respondent's presence he advised Mrs. Birmingham that "we could pay for nursing services." A diligent search of the record reveals no evidence that she was ever advised by anyone that she was not in relator's employ or that she was in the employ of Mrs. Birmingham. Further, the evidence discloses that relator's representatives prescribed the duties which respondent was to perform and exercised control in the method and manner of their performance; and it was established that, if she had failed to carry out such instructions, relator could have promptly dispensed with her services.

It is true that her paychecks were marked "for Clara Birmingham," but this in itself would not compel a finding that such a notation established that relator was not the employer, particularly after respondent had been led to believe by the actions and statements of relator's representatives that relator and no one else had hired her. She might well conclude that they were made for the purpose of keeping straight relator's records, or of indicating that her employment had reference to services furnished for Mrs. Birmingham at relator's request. See, Berger v. Church of St. Patrick, 212 Minn. 345, 3 N. W. (2d) 590. All such factors should be given consideration in determining this issue and, in my opinion, they compel affirmance of the commission's finding on this issue.

Relator contends that under M. S. A. 393.07 neither Miss Carpenter nor Mr. Zuckman had authority to hire respondent on relator's behalf, or to bind relator by such an employment contract. But it is not disputed that their statements as above set forth were in furtherance of the requirement of their employment and in compliance with § 256.15, authorizing nursing aid in welfare cases, and § 256.28, permitting welfare boards to pay for such services directly to the parties performing the same.

Furthermore, while § 393.07, relied upon by relator, provides that the commissioner of public welfare shall have exclusive control over the administration of personnel standards of the various welfare

boards, it does not provide that he shall have exclusive control over employment of personnel; or that in the application of standards for prospective employees, tests and interviews rather than inspection by field workers shall be deemed essential to a proper merit system. Accordingly, respondent here could well assume that all statutory requirements, and all regulations covering her employment by relator, had been complied with. See, Aslakson v. State Dept. of Highways, 217 Minn. 524, 15 N. W. (2d) 22.

It is urged that affirmance of the Industrial Commission's determination here would mean that the various county welfare boards of the state would be burdened with the additional expense of providing workmen's compensation for numerous part-time employees rendering special care in old-age assistance and like cases and would subject them to liability not contemplated in the legislation which created them. While this argument is not of controlling import, it may be pointed out that any such additional burden might be avoided if it is presently made clear to such employees that they are not employed by such boards but rather are the employees of recipients for whom they are rendering services. While a statement to such effect might not be conclusive on this issue (see, Schneider v. Salvation Army, 217 Minn. 448, 14 N. W. [2d] 467), in a close case it would be of aid in establishing the true intent of the parties. 1 Larson, Workmen's Compensation Law, § 46.30.

MURPHY, JUSTICE (dissenting).

I concur with the dissenting opinion of Mr. Justice Thomas Gallagher.